Docket No. 82186–Agenda 6–May 1998.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. 

 ANTHONY BROWN, Appellant.

JUSTICE MILLER delivered the opinion of the court:

After a jury trial in the circuit court of Cook County, the defendant, Anthony Brown, was convicted on two counts of first degree murder and on one count each of aggravated vehicular hijacking, aggravated criminal sexual assault, and armed robbery. The defendant waived his right to a jury for purposes of a death penalty hearing, and, following a hearing, the trial judge sentenced the defendant to death for the convictions for first degree murder. The judge sentenced the defendant to concurrent 30-year terms of imprisonment for his convictions for aggravated criminal sexual assault and aggravated vehicular hijacking; the judge did not impose any sentence for the armed robbery conviction, finding that it merged with that for vehicular hijacking. The defendant's execution has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a). For the reasons set forth below, we affirm the judgment of the circuit court.

The following evidence was presented at trial. We will describe this testimony in detail, in light of the defendant's challenge to the sufficiency of the evidence. Steven Fitch testified that on January 12, 1994, he, Reginald Wilson, and Wilson's girlfriend, Felicia Lewis, were driving in Wilson's Chevrolet Blazer. They stopped at a gas station so that Fitch and Wilson could use the restroom. When Fitch returned to the Blazer, he saw a person in the doorway on the passenger side of the vehicle; the person was letting someone else in the back. Fitch could see that the person standing outside the vehicle was not Wilson. As Fitch walked toward the Blazer, the person standing outside the vehicle asked Fitch what he was looking at. Fitch did not reply. He saw someone other than Wilson sitting in the driver's seat of the Blazer.

Fitch returned to the gas station, but the door was locked. The Blazer then drove off. Fitch ran across the street to a telephone to call the police. When the police arrived, Fitch reported what had happened, and he rode with the police to look for the Blazer. Wilson had a pager with him, so Fitch tried to call his friend on the pager throughout the night. Fitch did not receive any response, however.

On January 13, Fitch went to the Sauk Village police station and spoke with officers there. Later, Fitch went to Area One headquarters and talked to detectives. At Area One Fitch also viewed a lineup, and he identified the person whom he had seen standing outside the passenger side of the Blazer.

Zarice Johnson, a codefendant, also testified on behalf of the prosecution at the defendant's trial. Johnson, 26 years old at the time of trial, described the commission of the offenses in this case. On January 12, 1994, the defendant came to Johnson's apartment around 10 or 10:30 p.m. They then left together, in the defendant's car, a two-door Chevrolet Caprice. Three other persons–Scott Chambers, Stanley Hamelin, and Carl Williams–were already in the vehicle. The defendant drove around awhile, and Hamelin suggested that they steal a vehicle. The defendant agreed to that plan. They located a vehicle and parked near it, but they later changed their minds when they saw the number of persons in it.

The defendant then drove to a gas station located at 79th Street and the Dan Ryan expressway. Hamelin got out of the car to purchase gas; as he tried to close the car door, it swung open; the defendant became upset and said that anyone walking by could see a gun, a 9-millimeter pistol, that was sitting on the front seat of the car. The defendant then closed the car door. Hamelin bought gas and returned to the car. As they were leaving the station, they noticed another vehicle pulling in, and someone commented about the rims on it. Hamelin told the defendant to pull over so that he could get out. The defendant did so, and Hamelin, Chambers, and Williams then got out of the car and went back to the gas station. Johnson saw Chambers get into the vehicle, a Blazer. Hamelin stood by the passenger side; Johnson did not notice what Williams was then doing. Johnson next saw a person approach the passenger side of the Blazer and then walk back to the gas station fast, as though he was trying to get in the building. Johnson later saw the same person walk back to the side of the service station and climb a fence.

The defendant then drove his car around the block and returned to the gas station. Johnson could see Chambers and Hamelin, but not Williams. Chambers was standing on the driver's side, and Hamelin was on the passenger side of the Blazer. They got in the Blazer and it then drove off, following the defendant's Caprice. Johnson was seated in the back seat of the Caprice. The defendant drove the Caprice to the Dan Ryan expressway and drove north to 71st Street, where the defendant pulled to the side of the highway. The Blazer pulled off the road too and parked in front of the Caprice. The defendant got out and walked to the Blazer. Johnson stayed in the Caprice and therefore could not overhear the defendant's conversation with the occupants of the Blazer. After several minutes, the defendant returned to the Caprice and said that a man and a pretty woman were in the Blazer. The defendant then drove off, continuing northbound on the Ryan.

The defendant left the expressway at 43rd Street and drove to 47th and Vincennes. There, the defendant pulled into a parking lot and directed the Blazer where to park. The defendant got out of the Caprice and talked to Hamelin and Williams. Johnson was still seated in the back of the Caprice, but he could hear their conversation because the car door was open. The defendant asked the others if there was any “loot” in the Blazer. Stanley Hamelin mentioned a car alarm and stereo, and Carl Williams mentioned a CD player. The defendant also asked whether there was any money, and neither one responded immediately. The defendant then got back in the Caprice, and Stanley Hamelin walked over and handed the defendant a bundle of money, which the defendant put in his pocket. Hamelin also showed the defendant a ring he had taken, and Hamelin then put it back in his pocket.

The defendant said that he was going to make the woman perform oral sex on him; the defendant was laughing while he said this. The defendant went to the Blazer and told the woman to get out, and he directed Johnson to move to the front seat of the Caprice. Johnson moved to the front passenger seat, and Hamelin handed him a Kenwood stereo and a portable CD player taken from the Blazer. The defendant then put the woman in the back seat of the car and got in. After the act of oral sex, the defendant told the woman to remove her pants; she was crying, and Johnson told her to stop crying and to cooperate with the defendant. The woman then said that she had had a baby in November and that she was having her period. The defendant said the woman was lying, and she replied that she was wearing a sanitary pad. The defendant then told the woman to place her coat on the car seat, and he started having sex with her. Later, he told her to perform oral sex again. While they were in the car, the defendant forced the woman to submit to several acts of sexual intercourse.

The defendant instructed Hamelin and Chambers to keep the victims in the Blazer until the defendant returned, after he could locate a place to kill the victims. The defendant, Carl Williams, and Johnson then drove off in the Caprice. The defendant drove around the area where they had parked. The defendant later parked the car and walked back toward the Blazer with Carl Williams. The defendant looked at the Blazer, which was across the street, and then returned to the Caprice. The defendant was upset and said that he did not know why the victims had been killed in the Blazer and then left there sitting up. The defendant told Johnson to drive the defendant and Williams to the defendant's home, at 38th and Vincennes.

Johnson, the defendant, and Williams later met Hamelin and Chambers at Hamelin's sister's apartment. The defendant asked them why they had shot the victims in the Blazer. Hamelin responded that they did not kill the victims there, and he explained that he and Chambers had made the victims get out of the vehicle, had walked them to a dumpster, and had made them climb into it. Chambers then shot the man in the head once; the woman started screaming and put her hands up, and Chambers reached up under her arm and shot her twice. They then walked off, and Hamelin told Chambers that he was “bogus” because he had shot the woman twice and the man once–so Chambers returned to the dumpster and shot the man in the head again.

According to Johnson, the defendant that evening gave each of the offenders a part of the money taken in the crimes. They later returned to the Blazer and found about 20 to 25 compact discs and cassette tapes, which Chambers put in a plastic bag and gave to the defendant. Chambers then said that he wanted to take a large stereo speaker to Johnson's house, and they then did that.

The defendant returned to Johnson's apartment a couple hours later. Johnson and his cousin then left with the defendant, in the defendant's Caprice. Johnson noticed that the Blazer was parked behind the defendant's car, and that the Blazer contained Hamelin and Chambers. They got on the Dan Ryan expressway, with the Blazer following the defendant's car, and drove to Sauk Village; Williams was not with them. After parking at a McDonald's restaurant, the defendant gestured for Chambers and Hamelin to get in the Caprice, and they did. Later, Chambers and Hamelin drove off in the Blazer. They came back several minutes later, pursued by the police. Hamelin jumped out of the Blazer and tried to run; a female officer stopped her car, got out, and chased him. Hamelin fell, and the officer arrested him. Johnson, his cousin, and the defendant then drove back to Chicago in the defendant's Caprice.

Johnson was with the defendant again during the night of January 13, 1994, and they were arrested at that time. They were taken to a police station, and Johnson was questioned about the offenses. Johnson explained to the jury that he was charged in this case and that he later entered into a plea agreement. The agreement required Johnson to plead guilty to one count each of first degree murder, criminal sexual assault, armed robbery, and vehicular hijacking. In exchange for his truthful testimony, the State would recommend a 35-year sentence. Johnson said that he would be eligible for release after 17½ years if he received day-for-day good-time credit on his sentence. Johnson also said that he had lived in the witness protection program in the county jail for the five months preceding his testimony. On cross-examination, Johnson acknowledged that he initially denied his involvement in these offenses when police questioned him.

A nearby resident, Clemon Cunningham, discovered the victims' bodies around noon on January 13. Cunningham reported his discovery to the police, who then began an investigation. One of the officers responding to that call, James Hogan, a forensic investigator for the Chicago police department, testified that on the afternoon of January 13, 1994, he went to 4800 S. Vincennes to investigate a report of two bodies found in a dumpster. Hogan photographed the bodies and gathered up four cartridge cases. The cartridge cases were stamped “9 mm Win”; two of them were lying at the bottom of the dumpster, and two were lying on the chest of the male victim.

Mark DiSanto, a Sauk Village police officer, testified that on the morning of January 13, 1994, he received an assignment to check on a suspicious vehicle. Officer DiSanto went to the area, which was residential, and found a black Blazer parked with its engine running. DiSanto parked behind the vehicle and walked up to it, and the Blazer then speeded away. DiSanto followed the Blazer, which traveled a distance of about four or five houses and later came to a stop on a nearby lawn. The driver and a passenger jumped out of the vehicle and ran off in different directions. DiSanto chased the driver, Scott Chambers, and apprehended him. Another officer later arrived, and DiSanto saw that she already had the Blazer's passenger, Stanley Hamelin, in her squad car.

Edward Winstead, a Chicago police detective, testified that on the afternoon of January 13, 1994, he and his partner went to the place where the victims' bodies had been discovered. Winstead and the others removed the bodies from the dumpster. The female victim had a bra entwined in her hands. A photo identification card disclosed her identity as Felicia Lewis. No identification could be found on the male victim. The officers later went to the address on the woman's ID card.

Later that afternoon Officer Winstead went to Sauk Village; other detectives from Chicago were also there. Winstead spoke with the victims' friend Steven Fitch at the Sauk Village police station. Winstead testified that Fitch later viewed a lineup containing Chambers, Hamelin, and five other persons. Fitch identified Hamelin as the person he had seen getting into the Blazer.

Other testimony revealed that the defendant had about $500 or $510 in cash with him at the time of his arrest on January 13. Investigators later recovered a number of items from the defendant's Caprice, including videotapes, compact discs, cassette tapes, a Kenwood stereo, a Panasonic CD player, and an adapter.

Investigators examined the defendant's Caprice and Reginald Wilson's Blazer for fingerprints and searched the vehicles for other evidence. Investigators lifted three prints from various places inside the Caprice. They found an earring stud on the seat, a cassette radio in the trunk, and a glove and a stocking cap. They also inspected the Blazer. There, the only fingerprint impression they could find was on a compact disc. They also found an earring, a plastic camera, an instruction manual for a Kenwood stereo, a Kenwood storage case, a Panasonic CD player case, and various cards and papers.

Pamela Fish, employed at the time of the investigation by the Chicago police department crime laboratory, testified that on January 18, 1994, she examined evidence from this case. Fish stated that swabs taken from the female victim were all negative for the presence of semen. Fish explained that this was not unusual, and that half of these are negative. Fish determined that Felicia Lewis' blood type was type O. Fish also tested seat cushions taken from the Caprice and found a small area that tested positive for human blood. Its small size, however, precluded further testing. Fish said that the spot appeared to be a smear-type stain and that it could have been placed there by a person's hands.

Fish also found a reddish-brown stain the size of a nickel inside the underwear the defendant was wearing at the time of his arrest in this case. Fish concluded that this was a smear stain and was a mixture of human blood and seminal material. She later tested the defendant's blood type and found that it was type O, and she also obtained genetic markings from blood samples taken from the defendant and Felicia Lewis. Fish attempted to test the underwear stain for genetic markings but was unable to obtain any results. She explained that the inability to obtain a typing result from a stain is generally the consequence of two possible causes: that the sample is too small, or that the DNA material in the stain has degraded. On cross-examination, Fish stated that half the population in the United States has type O blood. She could not determine when the blood was placed on the car seat or when the stain was placed in the underwear.

Dr. Barry Lifschultz, a staff pathologist with the Cook County medical examiner's office, performed autopsies on the two victims. In examining Reginald Wilson, Dr. Lifschultz found a number of gunshot wounds. Two were located on the victim's head. One of these was an entrance wound to the right top of the head, and there was an exit wound in the left neck. Also, there was an entrance wound on the right side of the head above the ear, and an exit wound on the victim's face. Dr. Lifschultz also found a gunshot would to the upper left chest, and a bullet was lodged in the victim's chest. In addition, Dr. Lifschultz found a gunshot wound to the upper front part of the left arm, and a bullet was lodged in the elbow of the left arm. Dr. Lifschultz stated that the nature of this wound suggested that the bullet had traveled through something else before striking the arm, and he explained that the bullet could have passed through the head and then into the chest. Dr. Lifschultz concluded that the cause of death was multiple gunshot wounds.

In his examination of Felicia Lewis, Dr. Lifschultz found four gunshot wounds on her. An entrance wound was on the back of the lower part of the left arm, and there was a corresponding exit wound on the lower part of the arm. Dr. Lifschultz also found an entrance wound on the lower part of the arm, which exited on the inner part of the same arm. Dr. Lifschultz found two other gunshot wounds, and both of these were to the head. One was an entrance wound to the right side of the head, and he recovered a bullet from the jaw. Another entrance wound was to the middle part of the face, and the bullet from this wound was lodged in the upper left chest. Dr. Lifschultz stated that the wounds to the victim's arms were consistent with a person trying to shield herself. Dr. Lifschultz concluded that the cause of the victim's death was multiple gunshot wounds. A sanitary napkin was recovered from the victim, and swabs were taken of the victim's oral, vaginal, and rectal cavities. Dr. Lifschultz did not find any evidence of trauma to the victim's genital area.

The defense presented testimony from two witnesses. The first witness called by the defense was Richard McGrath, a Chicago police officer who worked as a latent fingerprint examiner. McGrath stated that he was not able to match any of the latent prints taken from the Caprice with the defendant's known fingerprint standard. On cross-examination, McGrath stated that the three prints from the Caprice did not match those of the defendant, Zarice Johnson, Scott Chambers, Stanley Hamelin, or Carl Williams. Felicia Lewis' fingerprints were found on a pill container and on a makeup case found in the Blazer. One of Reginald Wilson's prints was on an insurance document found in the Blazer, and also on a birth certificate found in the Blazer. McGrath was not able to match some of the prints with anyone. He said that it was not surprising that a car owner would not leave any latent prints in his own car, for the owner would be touching things repeatedly and would not leave clear impressions.

Also called as a witness by the defense was Scott Rochowicz, of the microscopic trace evidence unit of the Chicago police department crime laboratory. Rochowicz testified that in June 1994, he examined all the hair evidence in the case and compared it with samples taken from the defendant and from Felicia Lewis. Rochowicz found that the hairs recovered from Felicia Lewis' clothing were similar to her own hairs, and that the hairs recovered from the defendant's clothing were similar to his own hairs. Hairs found in the defendant's underwear were similar to his own hair, and not to Lewis'.

At the close of evidence, the jury returned verdicts finding the defendant guilty of the first degree murders of Reginald Wilson and Felicia Lewis, of the armed robbery of Reginald Wilson, of the aggravated vehicular hijacking of Reginald Wilson, and of the aggravated criminal sexual assault of Felicia Lewis. The matter was then continued for a capital sentencing hearing.

The sentencing hearing commenced on October 15, 1996, before the trial judge alone, the defendant having previously waived his right to a jury. The State alleged that the defendant was eligible for the death penalty because of his commission of multiple murders. See 720 ILCS 9–1(b)(3) (West 1994). Also, evidence established that the defendant, born on January 7, 1972, was 22 years old when he committed the present offenses. The State asked the judge to take judicial notice of the defendant's convictions in this case. At the conclusion of this stage of the hearing, the judge found the defendant eligible for the death penalty on the basis of the multiple-murder aggravating circumstance.

The matter then proceeded to the presentation of evidence in aggravation and mitigation. In aggravation the State introduced evidence of the defendant's criminal history, and in mitigation the defendant presented testimony from his family members, as well as a report prepared by a clinical social worker. In aggravation, Paul Wallace, a Chicago police officer, testified that on July 10, 1988, he arrested the defendant at the Museum of Science and Industry, in response to a report of an attempted pickpocketing incident there. According to the report, a woman riding in an elevator was bumped, and when she looked down at her purse she saw that it had been opened. Another woman in the elevator saw the defendant reach into the purse; when the second woman said something, the defendant withdrew his hand.

Chris Karedes, a sergeant with the Chicago police department, testified that on September 24, 1988, he was working as a patrolman and was called to the Holiday Inn City Center to investigate a report of an attempted pickpocket incident. According to the information Karedes received, two woman were about to get on the elevator when a man, not the defendant, pretended that his foot was stuck in the door. At that time, one of the women saw the defendant's hand coming out of her purse. The defendant and the other man then fled. The hotel doorman was able to capture the defendant, and the officer placed the defendant under arrest. Nothing was taken from the woman.

Vincent Avery, a Chicago police officer, testified that early in the morning on June 5, 1993, he stopped the vehicle in which the defendant was riding for a traffic violation. At the time, Officer Avery saw the defendant remove a weapon from the area of his waistband and put it on the floor of the car. The weapon turned out to be a semiautomatic .38 containing seven live rounds. Officer Avery also discovered a .38 revolver in the middle of the front seat of the car. The defendant later was charged with and found guilty of unlawful use of a weapon.

Eric T. Stokes, a security officer with the Cook County jail, testified that on March 17, 1995, he gave the defendant a disciplinary ticket for interfering with an officer's duties. Stokes had directed an inmate to remove civilian clothing and to put on a jail uniform, but the defendant had told the inmate not to do that. Officer Stokes told the defendant to mind his own business, and the defendant then swore at Stokes. The defendant received 10 days in solitary confinement for this infraction.

Raven Davis, who was 15 years old at the time of her testimony at the sentencing hearing, testified that on August 31, 1993, she was 11 years old and then lived with her grandparents. Her four younger brothers lived there, too. On that day she and three of her brothers went to a shoe store with their grandmother. The grandmother bought about $400 worth of shoes for the children, paying cash for the purchases. The defendant and other man, Mark, were in the store at the time. Later that night, Raven woke up and saw the defendant, Mark, and two women in her grandparents' house. The intruders were looking for money. During the incident, Raven was slashed in the throat by one of the women and was shot four times. Raven later identified the defendant in a lineup as one of the persons she had seen that night. On cross-examination Raven acknowledged that she did not initially tell the police that the defendant was one of the intruders. On redirect examination she again stated, however, that the defendant was present in the house and that he held a gun on her grandparents.

Further testimony in aggravation was provided by Crystal Lewis, sister of Felicia Lewis; by Mary Tinsley, aunt of Reginald Wilson, and Francita Williams, Reginald Wilson's mother. These three witnesses read victim impact statements that they had prepared. Their testimony will be summarized in greater detail later in this opinion.

The State also presented certified copies of the defendant's conviction for possession with intent to deliver, for which he was sentenced to probation. This also represented a violation of his bail bond, and he received 62 days in the county jail for the bail bond violation and 24 months' probation for the possession offense. Also, the defendant was convicted of unlawful use of weapons, the offense to which Officer Avery testified. The defendant was sentenced to six months' time served for that offense.

The defense presented several witnesses in mitigation. The defendant's mother, Joanna Brown, and an uncle, Michael Brown, and aunt, Victoria Brown, all provided favorable testimony. The uncle and aunt are siblings of the defendant's mother. The defendant also presented mitigating testimony from Dr. George Savarese, a licensed clinical social worker, who conducted a mitigation investigation for the defense and who prepared a report detailing his findings; Dr. Savarese's report was admitted into evidence. In conducting his investigation, Dr. Savarese interviewed the defendant and his family members, reviewed various records, and talked to a number of neighbors and teachers of the defendant.

The defendant attempted to cast doubt on Raven Davis' identification of him as one of the intruders in her grandparents' home. As part of the evidence in mitigation, the defense presented the parties' stipulation that a detective would testify that one of the doctors treating Raven Davis related that she was in shock and could not give a detailed account of the offenses when she was brought in for treatment. At that time, she could say only that the persons involved in the offenses wore masks and tried to harm her.

At the conclusion of the sentencing hearing, the trial judge sentenced the defendant to death for the two murder convictions. The judge also imposed concurrent 30-year terms of imprisonment for the defendant's convictions for aggravated vehicular hijacking and aggravated criminal sexual assault. The judge did not impose a separate sentence for the defendant's conviction for armed robbery, finding that it merged with the hijacking conviction.

I

The defendant first argues that the State failed to establish his guilt for the present offenses beyond a reasonable doubt. In particular, the defendant challenges the accomplice testimony of Zarice Johnson, a codefendant in these offenses. The defendant asserts that Johnson's testimony lacked the “absolute conviction of its truth” (
People v. Williams
, 65 Ill. 2d 258, 267 (1976)), and that the accomplice's testimony therefore fails to provide a sufficient basis for the jury's verdicts.

Although the testimony of an accomplice “ `has inherent weaknesses' ” (
People v. Young
, 128 Ill. 2d 1, 47 (1989)), it will be sufficient to sustain a conviction “if it convinces the jury of the defendant's guilt beyond a reasonable doubt.” 
People v. Smith
, 177 Ill. 2d 53, 74 (1997). A criminal conviction will not be set aside on appeal unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. 
People v. Howery
, 178 Ill. 2d 1, 38 (1997); 
People v. Tye
, 141 Ill. 2d 1, 13 (1990). The question on review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. 
Jackson v. Virginia
, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); 
People v. Collins
, 106 Ill. 2d 237, 261 (1985). Having reviewed the record in this case, we believe that Johnson's testimony is sufficient to sustain the defendant's convictions.

Johnson provided a detailed account of the events leading up to the offenses. He also described the commission of the offenses, beginning with the taking of the Blazer at the gas station, and ending with the murders of the victims in the dumpster. In addition, he recounted the steps taken by the defendant and the others to divide the money and property taken from the victims. Finally, he related the subsequent capture of Scott Chambers and Stanley Hamelin in Sauk Village, as well as the eventual arrest of the defendant in Chicago.

The record shows that Johnson's testimony was corroborated in many important respects. Johnson's testimony about the arrival of the Blazer at the gas station and the location of Hamelin on the passenger side of the vehicle was corroborated by prosecution witness Steven Fitch, who testified similarly, and who identified Hamelin as the person standing on the passenger side of the Blazer. Johnson's testimony about the placement of the victims in the dumpster, which he knew from what the codefendants had told him, was corroborated by civilian and police testimony describing the discovery and location of the bodies. Johnson further testified that each victim was shot twice; four cartridges were found near the bodies, and the medical examiner who performed the autopsy concluded that each of the victims was shot twice. Johnson also stated that one of the weapons in the car, and apparently used in the offenses, was a 9-millimeter pistol. The cartridges found with the bodies would have matched that weapon.

Johnson also stated that, during the sexual assault, the female victim told the defendant that she was wearing a sanitary napkin and was having her period. The pathologist found a sanitary napkin in the victim's clothing. In addition, a bloodstain was found on the back seat of the Caprice, where the assault occurred, and a bloodstain matching the victim's blood type was found in the defendant's underwear.

In addition, Johnson testified about the items taken from the Blazer, including a Kenwood stereo and a Panasonic CD player. Steven Fitch, who was with the victims immediately before the crimes, testified that he had brought his Panasonic CD player with him that night and that Reginald Wilson had a Kenwood stereo and an adapter in the Blazer. Investigators searching the defendant's Caprice discovered a Panasonic CD player and an adapter in the glove compartment and a Kenwood stereo in the trunk. Fitch identified the CD player as the one he had brought with him that night. Finally, Johnson's description of the arrests of Chambers and Hamelin in Sauk Village was corroborated by the Sauk Village police, who provided a similar account of the arrests.

The defendant acknowledges that portions of Johnson's testimony may be sufficient to establish the occurrence of these offenses. The defendant contends, however, that there is no corroboration of Johnson's additional testimony that the defendant himself participated in the crimes. In this regard, the defendant notes that his fingerprints were not found on any property recovered by investigators, or even in the Caprice, that no seminal fluid was found in the female victim, that the bloodstain found on his underwear matched his own blood type, and that there was no evidence of hair transfer between him and the female victim. The defendant maintains that the corroborating evidence discussed earlier simply confirms the occurrence of these offenses without implicating him in any way.

We believe that the record in this case contains sufficient corroboration of Johnson's testimony and that the lack of corroboration noted by the defendant is not significant here. Testimony adduced at trial demonstrates why the prosecution could not corroborate certain details in Johnson's narration. Notably, none of the 18 fingerprints lifted from the physical evidence could be matched to any of the five persons involved in the offenses. The fingerprint examiner explained that when he searched the Caprice its interior was quite damp, and he also stated that in cold weather persons do not leave fingerprint impressions as readily as they do in warm weather. In addition, the witness testified that it was not surprising that an owner would not leave impressions in his own car. The witness explained that a regular driver of a vehicle would be constantly handling everything and therefore would not leave clean, intact impressions.

In opposition to the jury's verdicts, the defendant also cites the testimony that seminal material was not found on swabs taken of the female victim. The prosecution's expert, Pamela Fish, stated that half of all sexual assaults test negative for the presence of semen. The witness did not elaborate on the reasons for the absence of seminal material in those cases. The bloodstain found on the defendant's underwear matched the blood types of the female victim and the defendant, both of whom had type O blood. According to the witness who obtained the underwear from the defendant after his arrest, the defendant did not bear any sign of injury and did not complain of any injury. Fish explained that she was unable to do more precise testing on the bloodstain because the DNA in the sample had degraded.

Given the detailed nature of Johnson's account of the offenses and the substantial corroboration of his testimony–including the discovery in the defendant's car of a number of items taken from the Blazer–we do not believe that the absence of the additional corroboration noted by the defendant is sufficient to undermine Johnson's testimony implicating the defendant in these crimes. A conviction will not be reversed “simply because the defendant tells us that a witness was not credible.” 
People v. Byron
, 164 Ill. 2d 279, 299 (1995). Any infirmities perceived in Johnson's testimony go to its weight as evidence and to his credibility as a witness. 
People v. Young
, 128 Ill. 2d 1, 51 (1989). The jury learned the details of Johnson's plea agreement with the State. In addition, the jury received the cautionary instruction on accomplice testimony. Illinois Pattern Jury Instructions, Criminal, No. 3.17 (3d ed. 1992). It was the function of the jury, as the trier of fact, to assess the credibility of the witnesses, the weight to be given to their testimony, and the inferences to be drawn from the evidence presented. 
People v. Tye
, 141 Ill. 2d 1, 13 (1990). As noted earlier, the question on review is whether, when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. 
Jackson v. Virginia
, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); 
People v. Collins
, 106 Ill. 2d 237, 261 (1985). Applying that standard to the present case, we must conclude that that the prosecution presented sufficient evidence of the defendant's guilt, and we see no reason to disturb the jury's verdicts.

The defendant next argues that the prosecutor, in his opening statement, improperly alluded to inadmissible victim impact evidence. The defendant complains of the following portion of the prosecutor's comments. After reminding the jurors that the judge had listed the names of witnesses and other persons involved in the case during jury selection, the prosecutor stated:

“Judge Gaughan listed, not just the name of Anthony Brown, but the names of some friends of his who committed these crimes with him. Their names you will hear throughout this trial. Their names were Zarice Johnson, Carl Williams, Scott Chambers, and Stanley Hamelin.

You also learned that the names of the two victims in this case were Reginald Wilson and Felicia Lewis.

But because of the nature of this proceeding, you will not learn much about the way in which Reginald Wilson or Felicia Lewis lived on this earth, and that's too bad. But you will learn everything that can be known about how Reginald Wilson and Felicia Lewis spent their last hour on the night of January 12 and the early morning hours of January 13, 1994[,] with the defendant because it was their misfortune and their tragedy to have to have the paths of their lives cross the paths of Anthony Brown and his friends that night.”

The defendant argues that this allusion to the lives of the victims was improper, for victim impact evidence is not admissible at the guilt-phase of a capital prosecution and the prosecutor therefore should not have commented on it.

Defense counsel did not object to this portion of the prosecutor's opening statement, and therefore the defendant's belated objection must now be considered waived. The defendant argues, however, that the present allegation is cognizable as plain error, and he makes the companion argument that trial counsel was ineffective for failing to object to this part of the prosecution's opening statement.

We do not agree with the defendant the prosecutor's comment was error. In contrast to the cases cited by the defendant, discussed below, the prosecutor's accurate statement to the jury did not reveal what the victim impact evidence might have consisted of. Simply calling attention to this type of information was not error, in the context in which the comments were made here. The prosecutor did not invite the jury to speculate about what the evidence would have revealed about the victims' lives. We note, moreover, that the comment complained of occurred at the beginning of opening statement, and we do not believe that the jury would have focused its attention on this particular comment, among the many made.

The cases cited by the defendant in support of this argument are distinguishable. In 
People v. Emerson
, 97 Ill. 2d 487, 496-97 (1983), the prosecutor told the jurors, “ `Well, ladies and gentlemen, we can't tell you everything he did after his arrest and he knows it. Maybe when this is over I will tell you what he did when he was arrested.' ” This court found reversible error in the prosecutor's suggestion that the defendant was guilty of further misconduct and the prosecutor's invitation to the jurors to speculate about what it might be. In 
People v. Bernette
, 30 Ill. 2d 359 (1964), the prosecutor elicited testimony about the murder victim's surviving family members and then commented on the information in closing argument. Because of that error, this court reversed the defendant's murder conviction and granted the defendant a new trial. See also 
People v. Littlejohn
, 144 Ill. App. 3d 813, 827 (1986) (reversible error found in prosecutor's comment that juvenile victim would never experience things that most people experience).

Unlike the cases cited by the defendant, the prosecutor in the present case did not comment about inadmissible matters or otherwise inform the jury of matters that would not be introduced into evidence. Here, the prosecutor simply attempted to erect a verbal bridge between the identification of the offenders, the identification of the victims, and the evidence to be presented at trial. Because we find no error in the prosecutor's comment, we have no need here to consider whether the comments rose to the level of plain error or, alternatively, whether defense counsel rendered ineffective assistance by failing to make an appropriate objection to the comment.

The defendant next contends that the prosecutor, in closing argument, improperly commented on the defendant's right not to testify at trial. See 
Griffin v. California
, 380 U.S. 609, 613-15, 14 L. Ed. 2d 106, 109-10, 85 S. Ct. 1229, 1232-33 (1965). In closing argument the prosecutor stated:

“The only people that could possibly tell you what happened in the back of the Caprice and what happened in the dumpster are one of the 5 individuals who planned this crime and who committed it, and that's why Zarice Johnson is a witness for the prosecution in this case. That's why. That's the reality of it.

One thing you will learn during this case and you will learn when Judge Gaughan gives you the instructions in this case, we have a system which says that people cannot be made to say things that they don't want to say, and in America people cannot be made to do things that they don't want to do under the law.

I'm not talking about when someone has a gun on you and you are made to do certain things and go to certain places. Under the law people have a right to say no. That's why it was necessary for us in this case to talk to Zarice Johnson to bring him before you because there was nobody else in this case among these 5 who could have told you exactly what happened except for Zarice Johnson. Felicia couldn't and Reginald couldn't, and Fitch wasn't able to, and that's why he's here. That's why Zarice Johnson is here.”

These remarks occurred near the beginning of the prosecutor's summation. The defendant contends that the comments improperly alluded to the defendant's exercise of his right not to testify at trial. The defendant maintains that the instruction referred to by the prosecutor was the one telling the jurors that they should not consider the defendant's failure to testify.

Defense counsel failed to object to this portion of the closing argument; recognizing that default, the defendant now contends that the comments were plain error and that counsel was ineffective for failing to register an objection to the prosecutor's argument. In response, the State maintains that the challenged comments, when read in context, were simply designed to help rehabilitate prosecution witness Zarice Johnson and to explain to the jurors why it had been necessary to seek his testimony. The State suggests further that the reference to the jury instructions was aimed at Johnson, and that Johnson could not be made to incriminate himself.

We do not agree with the defendant that the jury would have dwelled on the prosecutor's oblique reference to the defendant's failure to testify. We believe that if any error occurred in the preceding comments, it was slight and does not rise to the level of plain error. See 134 Ill. 2d R. 615(a) (on review, “[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court”). The plain error exception to the rule of waiver is properly invoked when the evidence is closely balanced, or the alleged error is so substantial that it denies the defendant a fair proceeding. 
People v. Banks
, 161 Ill. 2d 119, 143 (1994); 
People v. Childress
, 158 Ill. 2d 275, 300 (1994). We do not believe that either condition obtains here. We note also that the jury was instructed on the purpose of closing argument and was told that comments made in oral argument are not evidence.

For similar reasons, we do not believe that counsel rendered ineffective assistance by his failure to object to the prosecutor's brief comment. To prevail on a claim of ineffective assistance of counsel, a defendant must show both a deficiency in performance and prejudice resulting from counsel's error. 
Strickland v. Washington
, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). To establish prejudice, a defendant “must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.” 
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. In reviewing a claim of ineffective assistance, a court “need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.” 
Strickland
, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069. Here, the prosecutor made only a brief and indirect allusion to what might be considered the defendant's failure to take the stand in his own behalf. The prosecutor did not dwell on the point. We believe that any error in this regard was harmless beyond a reasonable doubt. See 
Chapman v. California
, 386 U.S. 18, 24-26, 17 L. Ed. 2d 705, 711, 87 S. Ct. 824, 828-29 (1967); 
People v. Howard
, 147 Ill. 2d 103, 147-48 (1991).

II

The defendant also raises several arguments regarding the sentencing hearing conducted in this case. The defendant first contends that the prosecution improperly introduced victim impact evidence at the second stage of the capital sentencing hearing. The defendant maintains that the challenged evidence violates the proscription of 
Booth v. Maryland
, 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529 (1987), because the statements expressed the witnesses' views of what they believed to be the appropriate punishment in this case. Given the nature of this contention, we will set out these comments in some detail.

The defendant specifically complains of the following portions of the victim impact evidence. First, Crystal Lewis, in reading her statement, said of her sister:

“She insisted that she was new mother, but it fell on deaf ears, ears of people who do not care for life, nor of what life had to offer. People like that, themselves, don't deserve to live another day because they simply don't appreciate life and how precious it is. There seems to be a large injustice that has occurred and something has to be done about it.”

The victim impact statement prepared by Mary Tinsley, Reginald Wilson's aunt, was read aloud by the prosecutor; it stated in part:

“It's our prayer that justice prevails and for the defendant, justice would be that this person who planned and maliciously traumatized and killed our loved ones, Reggie and Felicia, be put to death.

* * *

We have [not] seen nor heard any remorse, no apology. For these thugs deserve no sympathy for choosing acts of senseless violence of which they knew was wrong. They chose to rob, rape and kill Reggie and Felicia.

Our family's plea is that you, as Judge, give this defendant his just due of death, to be assured that he will no reap havoc on any other person and/or family; not for revenge, but for justice.”

The victim impact statement prepared by Francita Williams, Reginald Wilson's mother, was also read aloud by the prosecutor. It stated in part:

“Judge Gaughan, I am begging you to no longer waste our tax dollars on a person with no respect for the law or life. I am begging that you impose the stiffest penalty that you can by law on Anthony Brown. What he has done, I believe he is capable and would do again. Anyone who can take [the] lives of two humans and go out to eat as if nothing had happened, does not deserve to live. He left my grandson fatherless, my daughter, brotherless; and me, lifeless. God blessed me with two children, and now thanks to Anthony Brown, I have only one.

Society, and especially myself, do not want people like Brown on this earth. So please, please, please give Anthony Brown what he deserves, the death penalty.”

The defendant argues that the preceding evidence improperly characterized the offenses in this case and contained improper pleas for imposition of the death penalty.

In 
People v. Howard
, 147 Ill. 2d 103, 155-58 (1991), this court adopted the rule announced by the United States Supreme Court in 
Payne v. Tennessee
, 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991), allowing the prosecution to present victim impact testimony as evidence in aggravation at a capital sentencing hearing. In reaching that result, 
Payne
 overruled contrary decisions in 
Booth v. Maryland
, 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529 (1987), and 
South Carolina v. Gathers
, 490 U.S. 805, 104 L. Ed. 2d 876, 109 S. Ct. 2207 (1989). 
Payne
 did not address or disturb, however, 
Booth
's prohibition on the introduction of opinion testimony regarding the appropriate punishment for a capital defendant. 
People v. Scott
, 148 Ill. 2d 479, 553 (1992); 
Howard
, 147 Ill. 2d at 157. This court has similarly held that witnesses' opinions regarding the proper punishment in a capital case are irrelevant and therefore inadmissible at a capital sentencing hearing. 
People v. Harris
, 182 Ill. 2d 114, 155-56 (1998); 
People v. Stewart
, 105 Ill. 2d 22, 67 (1984).

In the present case, the defendant did not object to any of the comments challenged in this appeal. To overcome that procedural default, the defendant contends that the remarks complained of rose to the level of plain error and, alternatively, that counsel's failure to object to the comments constituted ineffective assistance. Both arguments must fail.

In imposing sentence, the trial judge made no reference to the victim impact evidence challenged in this appeal. The judge stated:

“I have reviewed the evidence from the trial. I have reviewed the evidence presented at the sentencing phase, both in aggravation and mitigation. I have heard the arguments of the attorneys. I have also reviewed the statutory mitigating factors and nonstatutory mitigating factors that are applicable to this case, and also to the aggravating factors that are applicable to this case.

This should never be a decision taken lightly. When it comes to somebody's time in life as it does, I think they should move on; but at this time, I can find no mitigating factors that are present to preclude the imposition of death on Mr. Anthony Brown.”

In light of the judge's comments, and the nature of the testimony offered by the witnesses, we do not believe that the portions of the victim impact statements now challenged by the defendant played any role in the trial judge's decision to impose the death penalty in this case. As we have noted, the defendant's sentencing hearing was a bench proceeding, and reviewing courts will assume that a trial judge considers only admissible evidence (
People v. Johnson
, 149 Ill. 2d 118, 153 (1992); 
People v. Terrell
, 132 Ill. 2d 178, 219 (1989); 
People v. Evans
, 125 Ill. 2d 50, 95-96 (1988)). Consistent with that precept, we will assume here that the trial judge did not consider the evidence now challenged by the defendant. Notably, the trial judge did not refer to the victim impact statements when he announced his decision to impose the death penalty. The defendant observes in his reply brief that the same judge, in sentencing codefendants to sentences other than death, spoke of his empathy for the surviving family members. That the judge did not make similar comments in this case suggests that the judge did not consider the challenged evidence here in deciding to impose the death sentence. Moreover, the evidence presented at the sentencing hearing was not closely balanced, and we do not believe that these brief portions of the family members' statements could have influenced the trial judge's sentencing decision. See 
Harris
, 182 Ill. 2d at 156-57.

The defendant next argues that the trial judge improperly denied the defendant's request to speak in allocution at the conclusion of the capital sentencing hearing. The defendant observes that the same judge allowed a codefendant, Stanley Hamelin, to speak in allocution at the conclusion of that person's separate capital sentencing hearing, and the defendant notes that the judge sentenced the codefendant to natural life imprisonment rather than to death. The defendant argues that he should have been allowed the same opportunity at his own capital sentencing hearing.

This court has consistently held that a capital defendant does not have either a statutory or a constitutional right to address the judge or jury in allocution in a capital sentencing hearing. 
People v. Brown
, 172 Ill. 2d 1, 61 (1996); 
People v. Childress
, 158 Ill. 2d 275, 307-08 (1994); 
People v. Tenner
, 157 Ill. 2d 341, 382 (1993); 
People v. Kokoraleis
, 132 Ill. 2d 235, 280-82 (1989); 
People v. Christiansen
, 116 Ill. 2d 96, 127-29 (1987); 
People v. Gaines
, 88 Ill. 2d 342, 374-79 (1981); see also 
People v. Szabo
, 113 Ill. 2d 83, 95 (1986); 
People v. Perez
, 108 Ill. 2d 70, 88-89 (1985). In addition, the court has held that allowing allocution in noncapital sentencing proceedings (see Ill. Rev. Stat. 1989, ch. 38, par. 1005–4–1(a)(5)) while forbidding it in capital sentencing proceedings does not deny capital defendants equal protection. 
Christiansen
, 116 Ill. 2d at 128-29; 
Gaines
, 88 Ill. 2d at 379-80. Here, the trial judge acted consistently with that extensive line of authority in denying the defendant an opportunity for allocution.

We do not believe that the judge's apparent inconsistency in allowing allocution in another case but not in this one unfairly penalized the defendant. The judge acted properly in denying the defendant's request to address the court. That the same judge, in prior cases, allowed allocution does not, in our view, require that this defendant now enjoy the same benefit, for we do not believe that the judge was required to render the same ruling here. Nothing suggests that the judge's decision not to grant the defendant's request for allocution rested on any invalid ground or was based on any animosity toward the defendant.

III

As a final matter, the defendant raises two challenges to the constitutionality of the Illinois death penalty statute. 720 ILCS 5/9–1 (West 1994). The defendant first argues that the Illinois death penalty statute is unconstitutional because, inevitably, innocent persons may be put to death under it. The defendant insists that no sentencing scheme could be devised that would always prevent the execution of innocent persons, and for that reason the defendant maintains that the present sentencing process must be considered unconstitutional. This court recently rejected the identical argument in 
People v. Bull
, No. 81578 (November 10, 1998). There, the court concluded that the sentencing system possesses sufficient safeguards to withstand constitutional scrutiny, and we see no reason to reach a different result in this case.

The defendant also argues that the death penalty statute places a burden of proof on the defense that effectively prevents the sentencing authority–judge or jury, as the case may be–from giving meaningful consideration to mitigating evidence. The defendant complains of the requirement in the statute that the death sentence be imposed unless there exists mitigating evidence sufficient to preclude imposition of that sentence. 720 ILCS 5/9–1(g), (h) (West 1994). The defendant asserts that this requirement prevents the sentencer from giving full effect to the mitigating evidence introduced by a capital defendant. Our court has repeatedly rejected this contention, however, concluding that the argument “rests on a strained interpretation of the statutory language” (
People v. Strickland
, 154 Ill. 2d 489, 539 (1992)), and we continue to adhere to that holding (
People v. Burgess
, 176 Ill. 2d 289, 322 (1997); 
People v. Harris
, 164 Ill. 2d 322, 350 (1994); 
People v. Page
, 155 Ill. 2d 232, 283 (1993); 
People v. Mitchell
, 152 Ill. 2d 274, 345-46 (1992); 
People v. Hampton
, 149 Ill. 2d 71, 116-17 (1992)).

* * *

For the reasons stated, the judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Wednesday, March 17, 1999, as the date on which the sentence of death entered in the circuit court of Cook County is to be carried out. The defendant shall be executed in the manner provided by law (725 ILCS 5/119–5 (West 1996)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is now confined.

Judgment affirmed.