FIRST DIVISION
AUGUST 16, 2010

No. 1-08-1876

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 06 CR 15526 |
| | ) | |
| BARRY PARKS, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | James B. Linn, |
| | ) | Judge Presiding. |

JUSTICE PATTI delivered the opinion of the court:

Following a bench trial, defendant, Barry Parks, was found guilty of one count of home repair fraud and one count of insurance fraud.[1]  The home repair fraud count upon which his conviction was based alleged that he entered into an agreement with Ava Goss for fire restoration home repair work at a cost of more than $10,000, but not more than $100,000, and that he knowingly promised performance which he did not intend to perform.  The insurance fraud count

---

[1]Codefendants John Eldorado, David Post, David English, and Arthur Smith were charged in separate indictments with various acts of wrongdoing and were tried simultaneously with defendant.  None of the codefendants is a party to this appeal.

upon which his conviction was based alleged that he knowingly obtained, attempted to obtain, or caused to be obtained by deception checks in an amount greater than $10,000, but not more than $100,000, from Allstate Insurance Company by providing false, incomplete or misleading information in a claim for home repair performance arising out of a fire at Goss's home.

BACKGROUND

At trial, Ava Goss testified that in the early morning hours of February 27, 2004, a fire significantly damaged her home at 9208 South Woodlawn Avenue in Chicago. She testified that she had insurance with Allstate to cover the cost of the repairs to her home. The morning after the fire, she met with Terry O'Keefe and Barry Parks from Action Fire Restoration (Action Fire). The two men were trying to get the job for the reconstruction work. She testified that O'Keefe spoke more than defendant during the meeting. Goss identified business cards that she had been given by certain contractors, but she was not asked to specifically identify defendant at trial.

Approximately two weeks after the fire, O'Keefe and defendant drove Goss to two houses to show her the work that had been done by Action Fire. After she looked at the houses, she signed a contract with Action Fire that was presented and signed by O'Keefe. Goss testified that Action Fire "promised to start on [her] home before they had got money from the insurance company and that the work would start soon." She testified that "she thought it was at least going to start within the month." After signing the contract, Goss did not have any contact with her insurance company regarding the cost of the repairs or the amount of money that they were going to give her for the work, as that was left to the adjuster. She testified that she did not receive a scope or an estimate from her insurance company regarding the repairs and that the only

check she personally received from Allstate was for the cost of the contents of her home, which amounted to about $40,000. O'Keefe would occasionally come out to her house after she signed the contract and "each time he would be riding with [defendant] in a black car." She testified that O'Keefe acted like defendant's boss.

Goss testified that approximately two months after she signed the contract, "two guys [who] were 18 and 20 years old" were sent to her house and started doing work on her roof. The board-up company had already installed boards on the roof and the two workers did not take them down but, rather, installed the roofing material on top of the board-up material. She called Action Fire to complain and told them that she did not want "two boys" working on her house. The work stopped and it did not resume until months later.

Goss called Action Fire frequently after signing the contract through November 2004. In August 2004, Action Fire sent codefendant David Post to her house and he went through the entire structure to see what needed to be done. He told Goss that her home would be completely restored. In October 2004, Goss took photos of the condition of her home which were admitted into evidence at trial.[2] She identified the photos and testified that electrical wiring was left unconnected and coming out of the wall. Her sidewalk "had been taken off" and the porch "had been chopped up or something." She testified that a washroom was left unfinished; paneling in the house was not cleaned; a sliding door was not installed; and the fixtures and counter were left unfinished in the kitchen. She further testified that there was a problem with the gas line at her property and that she was unsure whether the sidewalk was torn up to fix that issue.

_____

[2]The photos are not contained in the record on appeal.

3

Goss was also shown a check that was admitted into evidence at trial that was issued by Allstate for $45,651.34 on May 20, 2004, and was deposited by Action Fire into an account at Fifth Third Bank. Goss testified that she never received the check from Allstate and had not signed it. She further testified that her name was misspelled on the signature line on the back of the check as "Gross."[3]

Around October 2004, Action Fire sent Affordable Construction (Affordable) to work on her home for approximately two weeks. Affordable worked on "two floors," two bedrooms, her kitchen and the washroom. After completing some of the project, Affordable stopped because it was not being paid. Goss then personally expended at least $13,000 in order for it to continue the work. When asked if she had any further interaction with Action Fire, she responded that codefendant David English came to see her two or three times. He offered her $2,000, $5,000, and then $7,000 after she complained that the work on her house was not completed. She finally met with his boss, Tad Christiansen[4], the president of Action Fire, and he offered her $10,000. Goss refused all their offers because it was not enough to finish the home. Goss had codefendant

---

[3]The exhibit that Goss was asked to identify is not contained in the record on appeal. We note that defendant has attached to his appellate brief a purported photocopy of the exhibit which indicates that the check was made out to both Ava Goss and Action Fire Restoration and was "payment for the ACV of the dwelling damage arising from fire loss on February 27, 2004."

[4]Mr. Christiansen was identified by witnesses at trial by various different first names. For ease of identification, he and his wife Donna Christiansen are referred to as Mr. and Mrs. Christiansen throughout this opinion.

English return to her home, possibly in April 2005, and there were still problems that needed to be corrected. She also testified that a mechanic's lien had been placed on her property by Action Fire.

Jerome Dolan testified that he is a special agent with the National Insurance Crime Bureau, which is a not-for-profit agency funded by the property and casualty insurance industry. Dolan explained that after a residential fire, a homeowner would typically first contact his or her insurance agent, who would then contact the insurance company. A claim would be assigned and a claim representative designated. The responsibilities of the claim representative would include contacting the insured and assisting in the investigation and settlement of the claim. Dolan described a "scope" as a very precise description of the total loss. If the homeowner has a public adjuster, the public adjuster would represent the insured homeowner in dealing with the insurance company to negotiate a settlement of the claim. He testified that the public adjustor's interest may be adverse to the insurance company's interests because the public adjustor is attempting to receive the maximum coverage allowable under the policy.

Dolan further testified that a typical insurance policy would generally include the replacement of the property, reconstruction of a home, temporary living expenses, board-up costs, and anything that is designed to make the insured whole again. The first two payment priorities of the insurance company are to house the victim and then to protect the property from further damage by boarding it up. These first two payments may go directly to the homeowner, but often are made to the temporary housing entity or to a board-up company. The next payment would generally be issued to the homeowner for the actual cash value of the loss. The insurance

company ultimately issues a replacement cost value check, which constitutes the difference between the cost value that was paid out and the actual cost of replacing the insured property. He acknowledged that what actually has to happen in any given circumstance is dictated by the terms of the particular policy at issue.

Ronald Masino testified that he is a staff investigator for the producer regulatory unit of the Illinois Department of Insurance. He is responsible for investigating complaints filed by consumers against insurance companies and public adjustors. Masino testified that a public adjustor needs to be licensed and works for the consumer, the person who suffered the loss, and that he will negotiate depreciation and damages to the property with the insurance company on behalf of the consumer. Masino opined that if a public adjustor recommends a construction company, then he or she is responsible to the consumer for the work that the construction company has done. Masino testified that he was familiar with defendant, but he did not provide any testimony specific to defendant's relationship with the victim in this case or the claim that was filed with Allstate Insurance Company (Allstate).

John Dunleavy testified that he is a general contractor, operating as Affordable, and that he worked with Action Fire in 2004 and 2005 on a number of different projects, including at Goss's home. He believed that Mr. Christiansen was responsible for giving him the scope on Goss's home, which was completely gutted when he began working there and only the framing remained. His crew installed insulation, drywall, flooring, tile, hardwood flooring, cabinets, doors, windows, and a bathroom. He hired subcontractors to perform the electrical and plumbing work  Action Fire only paid Dunleavy a little bit at a time and he often had to pay out-of-pocket

6

to continue the work on Goss's house.   He and his crew ultimately stopped working because they were not being paid.  He testified that Action Fire owed him approximately $6,300 for his work there.   Goss asked him to finish the project but he was ultimately unable to do so because she could no longer pay him and his crew..

Lee Sila testified that he worked for Action Fire from December 2003 until May 2004. Action Fire was a reconstruction company located in Burr Ridge, Illinois, that focused on repairing fire-damaged buildings and was operated by Mr. and Mrs. Christiansen.  The company employed approximately 10 to 15 people inside the office, 3 to 5 public adjusters or salespeople, and approximately 12 employees that performed board-up work.  Sila positively identified defendant as one of the public adjustors that he remembered working at Action Fire.  He explained that defendant was also one of the outside sales representatives whose duties included securing contracts for Action Fire.  Sila testified that the board-up company owned by Mr Christiansen was listed under various different names on a rotation list, which allowed them to be called out more frequently after a fire.  The board-up company could then recommend Action Fire for reconstruction purposes.  He testified that the public adjustors, or sales people, would also go out to homes that had been damaged by fire.  Sila was responsible at Action Fire for doing the first initial estimate of the damage to the property after a contract was finalized.  He would typically go out to meet with the estimator from the insurance company and go over the scope.  Sila testified that Action Fire inflated estimates to insurance companies.  He did not provide any testimony concerning defendant's involvement with Goss or the claim at issue with Allstate.

Cory Meister testified that he is a licensed public adjustor and self-employed. He worked as a salesman for Action Fire around April 2004 until July 2004. Meister was responsible for bringing in business, particularly from losses due to fire or other catastrophic events. He testified that he also worked as a public adjustor at Action Fire, which was a position similar to that of a sales representative. He explained that "you sign repair contracts as well and then when you represent a client, you would sign them under a public adjustor's contract." He specifically testified that there is a repair contract and a separate contract to be represented by a public adjustor. Meister positively identified defendant in court as a public adjustor for Action Fire.

Ryan Fisher testified that he worked for Action Fire from April 2004 until October 2005. He was hired by Mrs. Christiansen initially to do general office work and to help with the collection of insurance proceeds. He explained that after Action Fire had a signed contract to repair a house, and there was an agreed-upon figure for that repair, he was responsible for expediting the payment from the insurance company and making sure that Action Fire's name was on the check. Fisher also worked with the insured client to have him or her endorse a check, if necessary, over to Action Fire. Fisher had contact with a homeowner by the name of "Ava Doss." He was responsible for attempting to have her endorse an insurance check to Action Fire, but she did not want to do so. Fisher placed the check in a folder in his desk drawer and later discovered that it was missing. He asked Mrs. Christiansen about it, and she told him that her husband had it endorsed over the weekend and that the check had been deposited. He testified that homeowners were also encouraged by Action Fire to sign a contract with Ferleger Insurance Services, a licensed public adjustor that worked out of the same office as Action Fire. Fisher

8

positively identified defendant at trial as a public adjustor and salesperson for Action Fire.

During closing arguments, the State conceded that it had not proved defendant guilty of one count of insurance fraud and one count of home repair fraud, both counts unrelated to the home repairs at Goss's home or the insurance claim with Allstate. The trial court found defendant not guilty of conspiracy to commit home repair fraud and conspiracy to commit insurance fraud. As to the remaining two counts, the trial court concluded:

> "I have listened carefully to all of the evidence about Mr. Parks. I have heard Ava Goss. I do not have an identification issue as to Mr. Parks. I do believe that from the totality of the evidence that the Government has met their burden of proof as to Mr. Parks as to Counts three [insurance fraud] and six [home repair fraud]. He will be found guilty of those counts."

The trial court denied defendant's motion for reconsideration. He was subsequently sentenced to 24 months' probation.

## ANALYSIS

Defendant contends that the evidence was insufficient to convict him of home repair fraud because the home repairs at Goss's home were substantially completed, that he was not the person who entered into the home repair contract with Goss, and that the State failed to prove that he made promises to perform work that he knew would not be performed. Defendant finally contends that his conviction should be reversed because he was not positively identified by Goss

at trial. The State responds that, due to the numerous examples of incomplete and substandard repairs at Goss's home, and the fact that the repairs were still incomplete eight months after the repair contract was initiated, the evidence was sufficient to support defendant's conviction. The State further asserts that the evidence established that defendant promised repair work on the home that he never intended to perform or that he knew would not be performed. The State also asserts that defendant was identified by name by Goss as one of the two individuals that she met with from Action Fire the morning after the fire and that her identification of defendant was corroborated by three other witnesses.

Upon review, a criminal conviction will not be reversed unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt as to the defendant's guilt. People v. Anderson, 188 Ill. 2d 384, 392 (1999). Determinations regarding the credibility of the witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence are the responsibilities of the trier of fact. People v. McLaurin, 184 Ill. 2d 58, 79-80 (1998). Therefore, as a court of review, we do not reweigh the evidence or substitute our judgment for that of the trier of fact. People v. Collins, 106 Ill. 2d 237, 261 (1985). Instead, the relevant inquiry is whether, after viewing the facts in the light most favorable to the State, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. People v. Brown, 185 Ill. 2d 229, 247 (1998). A criminal conviction may be based upon circumstantial evidence, as long as it satisfies proof beyond a reasonable doubt of the charged offense. People v. Hall, 194 Ill. 2d 305, 330 (2000). " '[O]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal

conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.' " (Emphasis in original.) <u>Collins</u>, 106 Ill. 2d at 261, quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979).

As a threshold matter, we reject defendant's claim that his convictions must be reversed because he was not properly identified by Goss at trial. While we recognize that a vague or doubtful identification of the accused is not sufficient to support a conviction (<u>People v. Rodriguez</u>, 312 Ill. App. 3d 920, 933 (2000)), we do not find that to be an issue in this case. Goss testified that she met Barry Parks from Action Fire the morning after the fire. Defendant was positively identified at trial by Sila, Meister, and Fisher as Barry Parks who worked as a public adjuster and salesperson at Action Fire. All three men had also been employed at Action Fire. Sila specifically testified that there were only three to five public adjusters or salespeople employed by Action Fire, which further diminished the possibility that defendant was not the Barry Parks that Goss referred to in her testimony. Consequently, we find no merit in defendant's claim that he was not properly identified at trial.

Turning to defendant's next claim, a person commits home repair fraud, in relevant part, "when he knowingly enters into an agreement or contract, written or oral, with a person for home repair, and he knowingly *** [m]isrepresents a material fact relating to the terms of the contract or agreement *** or creates or confirms another's impression which is false and which he does not believe to be true, or promises performance which he does not intend to perform or knows will not be performed." 815 ILCS 515/3 (a)(1) (West 2004).

In the instant case, Goss testified that she met with Terry O'Keefe and Barry Parks from

11

Action Fire soon after the fire at her home in February 2004, and that the two men were trying to get the job for the reconstruction work. She testified that O'Keefe did most of the talking during the meeting. About two weeks later, O'Keefe and defendant drove her to see two houses where Action Fire had done some construction work. Goss signed the repair agreement with Action Fire later that day. The contract was presented to her by O'Keefe, who also signed the document on behalf of Action Fire. The State argues that defendant then had a responsibility as the public adjuster to advocate on Goss's behalf and to ensure that the reconstruction work was done properly and in a timely manner. From the evidence, however, it is wholly unclear as to what role defendant played in the fire restoration project at the victim's home. Cory Meister, a licensed public adjuster who had worked at Action Fire, testified for the State that there are two contracts, a repair contract and another, separate contract to be represented by a public adjuster. While we recognize that defendant was a public adjuster and salesperson for the company, and went out with O'Keefe to solicit Goss's business, Goss did not indicate that she entered into a separate contract to be represented by defendant as a public adjuster, nor was she asked to identify any such document at trial. Moreover, Fisher, another witness for the State, testified that homeowners were encouraged by Action Fire to sign with Ferleger Insurance Services, a licensed public adjuster that worked out of the same office as Action Fire, and there is no evidence as to what relationship, if any, defendant had with that entity. We cannot assume that defendant was a public adjuster responsible for oversight over the reconstruction project at Goss's home simply because he and O'Keefe went out to solicit her business.

To complicate matters further, it was unclear as to what promises may have been made to

Goss by defendant in connection with the home repair project. She testified that Action Fire promised to start the reconstruction work soon, even before it was paid by her insurance company, but she did not testify as to who made this representation to her. Even if it was made by defendant, that alone would not support his conviction of home repair fraud. We also note that Goss testified that O'Keefe acted like defendant's boss, which would indicate that any promises concerning the repair work may not have been made by defendant himself. For the foregoing reasons, we find the evidence insufficient to support defendant's conviction of home repair fraud.

Defendant also contends that the State failed to prove him guilty of insurance fraud. He contends that his conviction should be reversed because the insurance claim submitted to Allstate was legitimate, the State failed to establish that a false insurance claim had been submitted, and defendant was never identified by any witness as engaging in conduct in connection to the insurance claim submitted to Allstate. The State responds that the evidence was sufficient because defendant told Goss that Action Fire would take care of all of her insurance claims and Action Fire submitted a claim for repair work that was not completed.

A person commits the offense of insurance fraud, in relevant part, "when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company *** by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company *** intending to deprive an insurance company *** permanently of the use and benefit of that property." 720 ILCS 5/46-1(a) (West 2004). Consequently, "[f]raud on an insurance company requires proof that the

13

accused obtained or caused to be obtained a sum of money by making false or fraudulent representations of loss to an insurer." People v. Buffman, 260 Ill. App. 3d 505, 512 (1994).

As previously discussed, the evidence presented at trial failed to establish that defendant was working as a public adjuster on the fire restoration project at Goss's home and it was unclear as to what representations defendant even made to Goss regarding the project. While the State presented extensive evidence from Jerome Dolan with the National Insurance Crime Bureau, and Ronald Masino from the Illinois Department of Insurance, neither witness was familiar with Goss's insurance policy or the claim that was submitted to Allstate, and they only provided background testimony as to the general practices and procedures of the insurance industry. Most importantly, the State provided no evidence from which to conclude that defendant was responsible for making a false or fraudulent insurance claim on Goss's behalf with Allstate. Consequently, we find the evidence was also insufficient to support defendant's conviction of insurance fraud.

Accordingly, the judgment of the circuit court of Cook County is, respectfully, reversed.

Reversed.

GARCIA, J., and LAMPKIN, J., concur.