2020 IL App (2d) 180073-U
No. 2-18-0073
Order filed January 28, 2020

**NOTICE**: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Boone County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13-CF-270 |
| ANTHONY M. PEREZ, | ) ) | Honorable C. Robert Tobin III, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Birkett and Justice Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's convictions of first-degree murder and other offenses were affirmed where: (1) the evidence was sufficient to support the convictions, (2) the trial court did not abuse its discretion in determining that defendant's proposed expert was unqualified to testify, (3) any error in admitting hearsay evidence was harmless, and (4) defendant forfeited his challenges to certain other evidence by presenting only a conclusory argument that the admission of such evidence constituted plain error.

¶ 2    Following a trial in the circuit court of Boone County, a jury found defendant, Anthony M. Perez, guilty of three counts of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2012)), two counts of attempted first-degree murder, aggravated discharge of a firearm (720 ILCS 5/24-

1.2(a)(2) (West 2012)), unlawful possession of a firearm by a street gang member (720 ILCS 5/24-1.8(a)(1) (West 2012)), and mob action (720 ILCS 5/25-1(a)(1) (West 2012)). The jury further found that defendant personally discharged a firearm. The court sentenced defendant to an aggregate of 95 years in prison. Defendant appeals. For the reasons that follow, we affirm.

¶ 3                                I. BACKGROUND

¶ 4      Giovanni Galicia, Jesus Casas, and Fermin Estrada were all members of the Sureño 13 street gang. Around midnight on November 29, 2013, they arrived together at Estrada's girlfriend's apartment in Belvidere after a trip to McDonald's. Galicia was in the driver's seat of his Chevrolet Impala, Casas sat in the front passenger's seat, and Estrada sat in the back behind Casas. A Lincoln Navigator arrived on the scene. Two armed men exited the Navigator. One of them approached the driver's side of the Impala, and the other approached the passenger's side. After a brief exchange of words, the man on the driver's side opened fire repeatedly on the vehicle, killing Galicia. Neither Casas nor Estrada was injured. The suspects returned to the Navigator and left the scene.

¶ 5      Shortly after the shooting, a police officer saw a Navigator driving in the direction where a police dispatch indicated that the perpetrators were expected to be traveling. When the officer began following the Navigator, the driver of the Navigator led him on a high-speed chase through Boone and Winnebago Counties. The Navigator eventually came to a stop in Rockford after sustaining damage during the pursuit. The occupants fled on foot. Police officers arrested Ricardo Garcia, Ricardo Figueroa, and Cheyanne Patton in a field to the west of the Navigator. Officers found the murder weapon and other incriminating evidence inside of the Navigator, as well as a second gun lying in the street nearby. Patton was initially uncooperative with and even belligerent toward the police. Hours after the shooting, however, she told the police that defendant was a

fourth occupant of the Navigator who escaped from the scene. Defendant turned himself in sometime later in the day on November 30, 2013.

¶ 6    The State's theory at trial was that the shooting was precipitated by a gang rivalry between the Sureño 13s and the Latin Kings. According to the State, Garcia was the driver of the Navigator, and Patton, Figueroa, and defendant were occupants. The State presented evidence that Figueroa was the person who approached the passenger's side of the Impala, whereas defendant was the person who approached the driver's side of the Impala and fired his weapon. Patton was a key witness for the State at trial. She portrayed herself as an unwitting participant in the events that took place on the night of the shooting. Due to the nature of the claims that defendant raises on appeal, we now summarize the evidence in greater detail.

¶ 7                           A. The Victims' Accounts

¶ 8    Neither Casas nor Estrada ever identified defendant as one of the perpetrators.

¶ 9    Casas did not get a good look at either of the men who approached the Impala. He could say only that the person who approached the passenger's side was bigger than the person who approached the driver's side. According to Casas, the man on the passenger's side tapped on the window with a revolver but did not say anything. Casas observed the man on the passenger's side only from the neck down, as it was very dark outside and the man tried to hide his face. The man on the driver's side wore a black ski mask that covered his entire face other than his eyes and mouth. Before the shooting, Casas heard the man on the driver's side say to the occupants of the Impala, "What's your mother fuckers' bang?" Casas understood this as asking which gang they claimed.

¶ 10   Estrada testified that the man who approached the passenger's side of the Impala weighed about 200 pounds. Estrada did not see that man's face. Estrada noticed that the person on the

driver's side was wearing dark clothes, including a hoodie. According to Estrada, that man was skinny, of "dark color," had long, curly hair, and had either a mask or a shirt covering his face. Estrada acknowledged telling police officers, with either 85 percent or 100 percent certainty, that the shooter was Christian Rubalcava. Estrada also told the police that, a couple days before the shooting, Rubalcava chased him in a Navigator that was similar to the one that he saw on the night of the shooting. Estrada had known Rubalcava for eight years. Rubalcava had long, curly hair.

¶ 11    Sergeant David Dammon of the Belvidere police department testified that he and another officer interviewed Estrada shortly after the shooting. During that interview, Estrada described the person who approached the driver's side of the Impala as 5'6" and of medium build. Estrada told Dammon that he was unable to identify the shooter's face, but he thought that he noticed medium-length hair that fell past the shoulders. Estrada also indicated to Dammon that he believed that the shooter was wearing a hoodie, had a beanie on his head, and had hair tied up in a ponytail. Estrada told Dammon that he was about 85 percent sure that the person's voice he heard before the shooting was the voice of Rubalcava. According to Dammon, Estrada explained to the officers that he was not pointing the finger at Rubalcava. Dammon never interviewed Rubalcava.

¶ 12               B. The Pursuit, the Arrests, and the Collection of Evidence

¶ 13    Galicia suffered multiple gunshot wounds and was pronounced dead at the scene.

¶ 14    Meanwhile, shortly after the shooting, at 12:29 a.m., Sergeant Daniel Reid of the Boone County sheriff's department received a dispatch that there had been a shooting and that a tan Navigator had left the area. Reid located and began following a Navigator that he believed was the suspect vehicle. The Navigator had tinted windows, so Reid did not have a clear view inside it. At one point, the Navigator pulled into a driveway, and Reid shined his spotlight on the driver's side of the Navigator. He could see movement inside from both a male driver and a back-seat

passenger on the driver's side. The Navigator then backed out of the driveway with its headlights off, accelerating directly at Reid's squad car. Reid reversed his car as fast as he could to avoid a collision. He pursued the Navigator at speeds well in excess of the posted speed limit. When the Navigator came to a stop in Rockford on Perryville Road near the intersection with Spring Creek Road, Reid stopped 30 yards behind it and shined his spotlight on the driver's side. Reid exited his squad car, and both the driver's door of the Navigator and the door behind it opened right away. Reid saw two male subjects, one of whom had a gun, exit the Navigator. Reid fired his weapon, and the two individuals ran westbound into a field.

¶ 15    According to Reid, his attention was focused on the two suspects who were running away, so he was not able to see anything on the passenger's side of the Navigator. After the two males ran into the field, however, Reid noticed a silhouette of somebody with longer hair who was running. Reid testified that this person appeared to be female, but he did not see where she came from or where she went. (Reid acknowledged that he previously gave testimony indicating that he saw a female "[r]ight in the back seat" of the Navigator.) Reid never activated his squad car's recording function during the pursuit, so there is no footage showing how many people fled on foot from the Navigator.

¶ 16    Officer David Mordt of the Boone County sheriff's department arrived at the scene shortly after the Navigator came to a stop. He observed two or three people running across Perryville. He drove down the street and eventually arrested Figueroa in an open field.

¶ 17    Sergeant Edward Krieger of the Boone County sheriff's department arrived at the scene shortly after Mordt. Krieger saw three figures running to the west, but he could not ascertain whether they were male or female. He noticed that all of the doors to the Navigator were opened. He then heard somebody yell out for help from directly west of the Navigator. He saw Garcia,

who had been shot (presumably by Reid), on the ground. Krieger arrested Garcia and returned to the Navigator. Krieger looked inside the Navigator and saw a black .40 caliber Glock semi-automatic handgun with an extended magazine sitting on the driver's seat. Krieger also noticed a revolver lying on the road near the driver's side of the Navigator.

¶ 18    Officer Joshua Hecker of the Loves Park police department arrived after Krieger. Hecker located and arrested Patton near a "pine tree wood line" in the area.

¶ 19    Over the next few hours, the police investigated and processed both the Belvidere shooting scene and the area where the Navigator came to a stop in Rockford. Upon conducting a more thorough search of the Navigator, an officer found two masks on the rear driver's side floorboard. One was a ski mask and the other was a mask that was reminiscent of the 1996 horror film *Scream*.

¶ 20                              C. Forensic Evidence

¶ 21    The only fingerprints that were suitable for comparison came from the Navigator. Four prints were linked to Patton, nine were linked to Garcia, and one was determined not to have been made by Garcia, Patton, Figueroa, or defendant. The Glock handgun was determined to contain a mixture of deoxyribonucleic acid (DNA) from at least two individuals. There was a major female profile along with an incomplete minor profile. Patton, the only female who submitted a swab for comparison, was excluded as contributing to that major profile. A firearms examiner determined that all 13 of the cartridge casings that were recovered from the Belvidere shooting scene were fired from the Glock handgun that was found inside the Navigator.

¶ 22    A forensic scientist found a DNA mixture of at least three individuals on the ski mask. The profile was incomplete, however, and was unsuitable for comparison. A second scientist tested the ski mask with different techniques. A vacuum swabbing generated a DNA profile consisting of at least four contributors, but no conclusions could be drawn as to the sources. Cutting the

mouth area of the ski mask generated a mixture of at least three contributors. Defendant, Garcia, and Figueroa were excluded as contributors.

¶ 23                                D. Patton

¶ 24    Patton testified for the State and implicated defendant in the shooting. She acknowledged that she had a criminal record. She described the events of November 29-30, 2013, as follows.

¶ 25    On the evening of November 29, 2013, there was a party on Strawberry Lane in Belvidere at the house where Patton lived with Garcia, who was her boyfriend, and Mallek Sanchez ("Tone"). Garcia was a member of the Latin Kings, but he was trying to get out of the gang. Patton arrived at the house at nighttime, and Garcia drove her there in his Navigator. There were quite a few people there when she arrived, including Tone, Figueroa ("Jock"), and "Shadow." Patton identified defendant in court as the person whom she knew as "Shadow."

¶ 26    Patton testified that Jock and Shadow were both members of the Latin Kings. She met them a couple of months before this party through Garcia. Although she was not 21 years old at the time, Patton was drinking at the party. Jock, Shadow, and Daniel Ambriz ("Quette") "took pictures with a gun." Patton described that gun as black, "bigger" as opposed to "smaller," and having an extended "clip." Jock and Shadow left the house at some point with Quette. Patton then began to leave with Garcia in his Navigator to get more beer and cigarettes at the Mobil station. Patton was sitting in the front passenger's seat.

¶ 27    According to Patton, as she and Garcia were leaving the house, Quette pulled in and flashed his lights. Garcia went to see what Quette wanted. Quette came up to Patton, gave her money, and told her to get more beer. Jock and Shadow then got in the back of the Navigator. Patton was not sure, but she believed that Jock was sitting behind her and that Shadow was behind Garcia. Either Jock or Shadow told Garcia to go to some apartment buildings in "Little Mexico" or "Little

Village" to "get at somebody." Patton was not familiar with that area, and she did not ask questions.

¶ 28   According to Patton, Garcia drove the foursome to some apartments in Belvidere, at which point Jock told Garcia to stop. Jock and Shadow jumped out of the Navigator and told Garcia to "drive down." Patton and Garcia stayed in the Navigator and started to drive. They did not get far before Patton heard gunshots from nearby. Jock and Shadow ran back to the Navigator and got in. Patton explained that Shadow "laughed and said that he shot that nigga in the face." Patton then noticed that Shadow was holding the same gun that he had been "taking pictures with" earlier in the evening. Patton claimed that, prior to this point, she had not seen any guns in the Navigator. Jock and Shadow then told Garcia to drive, so he started to drive to Rockford.

¶ 29   Patton testified that the group saw a police car at some point. She explained that Garcia was scared, so he drove faster than the speed limit instead of stopping. Patton testified that she, Garcia, Jock, and Shadow got out of the Navigator and ran when the vehicle came to a stop in Rockford. Patton ran to the left from the Navigator, as did Garcia and Jock. Patton did not see which direction Shadow went. Patton briefly stopped when she saw Garcia get shot, but then she started running again. Patton acknowledged that she had a warrant out for her arrest that night and that she attempted to hide from the police because she was scared. She eventually surrendered and was taken into custody.

¶ 30   According to Patton, she was very scared while she was in the squad car, so she initially denied knowing anything about the shooting. She was later interviewed at the Belvidere police station, at which point she was still scared because "somebody just got killed." She refused to cooperate. She was transported to another room and had an opportunity to sleep. Several hours later, after having "time to think about everything," Patton asked to speak with the officers again.

At that point, she told them "what [she] knew" and identified Shadow from a photographic lineup.

¶ 31   Patton testified that, at the time of the shooting, she did not know Rubalcava. She subsequently learned who he was. She insisted that she did not see Rubalcava on the day of the shooting and that he was not in the Navigator with her group.

¶ 32   On cross-examination, Patton testified that she was wearing the Latin King's colors on the night of shooting. She also had a tattoo that said "King Creeper," which referred to an ex-boyfriend who was a Latin King. She acknowledged ranting at the arresting police officer because she was upset. She was drinking on the night of the shooting, but she denied that she was drunk. She had told officers on the night of the shooting, however, that she was drunk and that she did not know what was going on.

¶ 33   Patton further testified on cross-examination that when an officer told her several times during the initial interview that she was going to be charged with murder, she was scared and refused to talk. The reason she was scared was because defendant killed somebody and she was put in a situation that she should not have been in. At 11 a.m. on November 30, 2013, after having time to think about what was going on, and fearing that she was going to be charged with murder, she decided that she wanted to talk.

¶ 34   Patton testified on cross-examination that she never posted pictures on her Facebook account of people posing with the gun with the extended "clip." She did not know whether anybody else posted pictures of the gun on Facebook. Patton further testified that, although she did not like Shadow now, she did not have a problem with him as of the night of the shooting. She acknowledged telling the police, however, that she did not like Shadow and that they had gotten into an argument the previous month. She testified that that issue was "old." She said that she would not have allowed Shadow into her home if she had a problem with him.

¶ 35    On re-direct examination, the State asked Patton questions about why she was afraid of the gang when she spoke with the police. Patton explained that, in gang culture, and especially with the Latin Kings, snitching was looked upon as "bad." She added that snitches "usually end up getting killed," but the court struck this portion of her testimony. Patton testified that part of the reason why she was scared that night was that gang members do not like people who snitch on them. She thought that she would get killed if she snitched in this case.

¶ 36                    E. Jailhouse Informants

¶ 37    Hugo Pena and Patrick Brooks testified for the State and detailed their respective conversations with defendant in the Boone County jail.

¶ 38                    1. *Pena*

¶ 39    Pena testified that he was currently incarcerated on pending charges of aggravated domestic battery and domestic battery. He entered a cooperation agreement with the State's Attorney's office. In exchange for his truthful testimony in this case, the State would recommend that he receive a sentence of three years in prison on his class 4 domestic battery charge, and the more serious charge would be dismissed. Pena also had pending retail theft charges in Winnebago County that were unaffected by the cooperation agreement. Pena's criminal history included convictions for bail jumping, possession of a controlled substance, home invasion, armed robbery, and unlawful use of a weapon.

¶ 40    Pena explained that he was in the Latin Kings with defendant. They were also cellmates for a time. Defendant talked about his case to Pena on five or six occasions and seemed to be bragging. Nobody else was present during those conversations. Defendant told Pena that he and Figueroa got into Garcia's truck and that defendant told "them" to drive to Little Mexico. According to Pena, Little Mexico was where the Sureños were in Belvidere, and the Latin Kings

and the Sureños did not get along. Asked whether defendant told him why they were going to Little Mexico, Pena responded that defendant said that they went because "they was at it with each other." Defendant told Pena that Patton was there too.

¶ 41    Defendant informed Pena that he had been at Tone's house before going to Little Mexico. Pena knew that Tone lived on Strawberry Lane, and Pena testified that it was common for people to hang out there. Defendant told Pena that he wanted to go to Little Mexico "[t]o get at them," which, to Pena, meant to harm them or do something to them. Defendant told Pena that when they got to Little Mexico, he walked to the driver's side of a car while Jock went to the passenger's side. Defendant said that he asked the occupants of the car "what they is," which, to Pena, meant what gang they were in. Defendant told Pena that when the occupants of the car rolled the window down, defendant saw "his" face (presumably, Galicia's) and then "unloaded on" or shot at "them." According to Pena, defendant did not mention what type of weapon he had, how many times he fired, or what he was wearing that night. Defendant did tell Pena, however, that he gave somebody a "dome shot," which meant a shot to the head.

¶ 42    Pena testified that defendant said that he and Jock then ran back to Garcia's truck and told Garcia to take off to Rockford. Defendant said that the police chased them until the tires went out, at which point they stopped the truck, and everyone took off running. Pena testified that he knew that defendant had gotten away from the police. Pena thus asked defendant why he turned himself in. Defendant responded that his mother told him that it would be better to do so. Defendant also told Pena that he tried to hide the gun under the seat during the police chase.

¶ 43    Pena testified that defendant discussed the evidence that the State was going to present and what his defense was going to be. Specifically, defendant told Pena that a police officer said that there were three people in the vehicle. Defendant told Pena that he ducked down behind the seat.

Defendant was thus going to point the finger at the three people who got caught. Defendant also mentioned to Pena that there was female DNA on the gun. Defendant related to Pena that he believed that the DNA came from when he hit his "baby's mama" with the gun.

¶ 44    In the day or two after the murder, Pena saw photographs of multiple people, including defendant, on Facebook. Pena recognized those photographs as having been taken in Tone's basement. Pena noticed that defendant was "showing" a "pretty big" gun in a photograph or some photographs. Defendant was also wearing a black windbreaker jacket, a "du-rag," and a hat on top of that du-rag. During his conversations with defendant at the jail, Pena mentioned these photographs to defendant. Pena testified:

> "Well, I told [defendant] because I was remembering that—remembering seeing the pictures, and I told [defendant] why that person [presumably, Estrada] was saying that [the shooter] had long hair. I told [defendant] because I seen him in the pictures that he had the du-rag and the du-rag looks like he has long hair."

Pena testified that defendant then "kind of laughed and gave me a smirk like I got it." The specific photograph or photographs that Pena described were not admitted into evidence; apparently, they were never even in the State's possession.

¶ 45    Pena testified that he was 43 years old and that defendant was 23 or 24. According to Pena, it was common in gang culture for younger members to approach older members. The reason for that was because the older members would have more respect and ranking within the gang. Pena explained that one would gain respect and ranking within the gang by doing things for the gang. Asked how it was viewed in gang culture for one member of the Latin Kings to testify against another, Pena responded: "Bad. Not good at all." Asked why he was testifying, he said, "I just feel I'm doing the right thing right now."

¶ 46     Pena denied speaking with anybody other than his attorney, the prosecutor, and detectives about what defendant told him.  Nobody other than defendant told Pena the specific facts of this case.  Pena had no personal knowledge of the case apart from what he had seen on the Internet shortly after the shooting.  He never overheard or saw defendant speaking with anyone else in the jail about this case.

¶ 47     On cross-examination, Pena testified that he used to be known as "King Weasel."  He said that it is not common in gang culture to be a snitch, but it happens when you are getting a deal. Pena acknowledged that he was facing 3 to 14 years in prison and that, in exchange for his testimony, the State was recommending that he receive 3 years with day-for-day good-time credit. He testified that nobody asked him to wear a wire, even though he continued to share a cell with defendant after coming forward with information.

¶ 48     Asked about the photographs that he saw on Facebook shortly after the shooting, Pena testified that Patton was in some of them and that they were posted on numerous people's pages, including Quette's, Figueroa's, and Patton's.  Pena clarified that he spoke to defendant about those photographs, but defendant never spoke to him about them.  The photographs were taken down. Pena did not have copies of them, as he had not seen any reason at the time to take a screenshot of them.  He expressed surprise to a detective that the photographs were not going to be used at trial.

¶ 49     Pena denied that defendant was in possession of transcripts from this case when the two of them shared a cell.  Pena did see, however, defendant read Patton's deposition.  (Patton gave a deposition prior to defendant's trial, which was to be used if she failed to attend the trial.)  Pena testified that he was removed from this tier of the jail after he got in a fight.  Defendant did not jump in and help him in that fight.

¶ 50     On re-direct examination, Pena explained that he did not remember the Facebook

photographs until he spoke with defendant at the jail. Pena denied coming forward with information just so that he could get a deal in his own case. Indeed, he was not happy with the deal that he received. He was not mad at defendant for failing to help him during the jail fight.

¶ 51                                  2. *Brooks*

¶ 52    Brooks testified that he was currently incarcerated on two counts of delivering a controlled substance within 1000 feet of a senior housing complex. Those were class X felonies that were punishable by 6 to 30 years' imprisonment. Brooks entered into a cooperation agreement in exchange for his testimony against defendant. Pursuant to that agreement, he would plead guilty to one of the pending charges, the other would be dismissed, and the prosecutor would recommend a prison sentence of seven years. Brooks' criminal history included convictions for two counts of aggravated fleeing, retail theft, and multiple drug offenses.

¶ 53    Brooks testified that he met defendant in the Boone County jail around March 2017 when they were in the same housing unit. A couple weeks later, they started talking about their respective cases. They had multiple conversations, but Brooks did not remember specific dates. Brooks recalled defendant saying "no face, no case," meaning that defendant would beat the murder charge because the State did not have any evidence. Brooks perceived that defendant "showed no remorse about the situation."

¶ 54    Brooks testified that defendant told him about the following series of events on the night of the shooting. Defendant, whose nickname was Shadow, was a member of the Latin Kings. Defendant was riding with a codefendant and two other people, one of whom was female (defendant did not tell Brooks their names), when they spotted the car of what they believed were rival gang members. The group pulled off and parked in a lot next to where the car was backed in. Defendant and a codefendant got out and walked toward that car. Defendant exchanged words

with the driver of the car and asked what gang they were in or whether they were with a certain gang. The people in the car were Sureños and were familiar to defendant. Defendant pulled out his gun and shot "them" twice. Defendant and a codefendant ran back to their car and got in a high-speed chase. Defendant ducked down in the back seat of the car during the police chase, which ended by "Perryville and Alpine." Defendant and "[t]he guy who was with him" jumped out of the car and went in opposite directions; only two people jumped from the car. The guy who was with defendant when he jumped out of the car ended up getting shot. There was a gun and a mask left inside of the car in which defendant had been riding. The gun had "a girl's DNA on it" but did not contain defendant's fingerprints. Defendant indicated that the female DNA may have been because he put the gun to the head of a girl a couple days before the shooting. During the shooting, defendant wore a mask with a du-rag and a "skully cap" over the top of it. According to Brooks, a skully cap is "a workman's winter skull cap" that goes over the top of one's head.

¶ 55    Brooks testified that defendant talked about how he was going to beat his case, given that he had two good lawyers and there were no prints or DNA. Defendant mentioned that he turned himself in upon hiring a lawyer because it made "the case look better." Defendant also said that he had a photograph on Facebook showing him with "the gun." Defendant took that photograph off of Facebook before the shooting.

¶ 56    Brooks claimed that he was not a member of any gang. In August 2017, he told his attorney about the information that he had. He "felt like it was wrong" and that "somebody need[ed] to know about what really happened." He was not expecting a deal, but he subsequently entered into a plea agreement. He had no personal knowledge of the facts of this case before talking to defendant, and nobody other than defendant told him the specifics of the case. He only spoke to his attorney, the prosecutor, and detectives.

¶ 57    On cross-examination, Brooks testified that defendant told him the following additional details about the shooting. A female was driving that night. Defendant liked a certain two-tone gun, but defendant did not say whether that was the gun that was used in the shooting. The gun that was in the Facebook photograph that defendant took down was two-toned: silver and black. There were two shots fired, one to the stomach or chest of the victim and one to the head. Defendant wore all black. In addition to the mask and a gun, there were gloves that were left in the car. Brooks further testified that, although he knew that defendant had transcripts related to this case while incarcerated, he never saw those transcripts. Nor did he see Pena reading the transcripts. Brooks initially was given an offer to serve 20 years in prison for his pending charges; pursuant to his current agreement with the State, he would only serve 7 years.

¶ 58                    F. Expert Gang Testimony

¶ 59    Dammon testified for the State as an expert on street gangs. He explained the general nature of gangs. For example, they have a recognized hierarchy or leader, they focus on criminal activities, and they have an organizational structure. According to Dammon, in Belvidere, the Latin Kings and the Sureños have a rivalry. That means that "[t]hey have a propensity to fight with one another, perform violent acts against one another as well as other crimes." Dammon identified defendant, Figueroa, Garcia, Patton, and Rubalcava as members of the Latin Kings. He identified Galicia, Casas, and Estrada as members of the Sureño 13s. During Dammon's testimony, the court admitted into evidence a photograph depicting numerous individuals—including defendant, Figueroa, and Garcia—posing in front of a flag while using hand gestures associated with the Latin Kings.

¶ 60                    G. Cellular Phone Evidence

¶ 61    The State's theory was that on November 30, 2013, defendant was in possession of an

iPhone that was assigned number (815) ***-3459 and that he made or received numerous calls around the time of the shooting. This included calls to and from phone number (815) ***-5916, which the State believed belonged to defendant's mother, Angie Perez. Testifying as an expert for the State, Joseph Raschke used the information that was discernible from Sprint's records pertaining to phone number (815) ***-3459 to approximate defendant's locations around the time the shooting.[1] The State also presented evidence about allegedly incriminating Internet searches that were conducted on Angie's phone in the hours and days after the shooting.

¶ 62                              1. *Washburn's Testimony*

¶ 63    The State attempted to link phone number (815) ***-3459 to defendant through the testimony of Sergeant Chris Washburn of the Belvidere police department. Washburn testified that he spoke with witnesses as part of his investigation of the shooting. Based on that investigation, on December 16, 2013, he obtained a search warrant for Sprint's records related to phone number (815) ***-3459. On December 24, Sprint provided him with records containing subscriber information, account information, ingoing and outgoing calls, and cell-site information. Those records indicated that the subscriber for the account associated with phone number (815) ***-3459 was defendant's father, Manuel Perez, who resided in Belvidere. On December 27,

---

[1] The State initially intended to use Sergeant Chris Washburn of the Belvidere police department as its expert. Prior to trial, the court found Washburn unqualified to testify about the historical cell-site analysis of the phone number that the State believed belonged to defendant. Raschke testified at trial as a substitute for Washburn. Also prior to trial, the court found defendant's proposed cellular technology expert, Joseph Kennedy, unqualified to testify. We will provide additional factual background about these pretrial decisions in the analysis section.

Washburn obtained a warrant to search Manuel's residence to find certain cellular phones. The search was conducted that day.

¶ 64    According to Washburn, officers seized a Samsung cellular phone directly from Angie. They also seized an iPhone that was found in a room with the belongings of Nina Perez, who apparently was defendant's sister. Washburn determined that there was no lock on the iPhone, so he looked at the phone's settings and saw a heading that said "Anthony's stuff." Washburn obtained warrants to extract data from the two phones. In February 2014, a detective from the DeKalb County sheriff's office extracted information from the phones and gave the records that were generated by the search to Washburn.

¶ 65    Washburn testified that he reviewed the extraction records. According to Washburn, the records showed that the iPhone was presently assigned the number (815) ***-0908 and that the owner's name was listed as "Anthony." However, the records also showed that this iPhone had used the Apple messaging application multiple times between November 14 and November 28, 2013, to communicate with telephone number (815) ***-0908, and the name associated with that number at that time was displayed as "Nina." In other words, although this iPhone was assigned number (815) ***-0908 as of February 2014 when the extraction was performed, in November 2013, the phone had been used to exchange messages with Nina at that same phone number. Furthermore, Washburn noticed that the extraction records of the iPhone displayed certain incoming and outgoing calls that corresponded with the records that he received from Sprint pertaining to telephone number (815) ***-3459.

¶ 66    Washburn also testified about the Internet search history of the Samsung phone that was seized from Angie. The extraction showed a search at 4:03 a.m. on November 30, 2013, regarding "a serious shooting and police chase and shots fired." According to Washburn, as of 4:03 a.m. on

November 30, the Belvidere police department had not released information regarding this case. Moreover, on December 5, 2013, while defendant was in custody, somebody used this Samsung phone to conduct Internet searches about "how to completely remove gun powder residue from my clothes and arms." What further drew Washburn's attention about the extraction of the Samsung phone was that the phone was assigned number (815) ***-5916; according to Sprint's records, that number had been in repeated contact with phone number (815) ***-3459 between 12:22 a.m. and 1:56 a.m. on November 30.

¶ 67    On cross-examination, defense counsel quibbled with Washburn about whether the call records were "exact" if they were off by hundredths of seconds. The court ultimately called a sidebar. The court stated for the record that defense counsel was "picking the fight" with Washburn even though Washburn answered counsel's questions. Washburn then testified on cross-examination that, as far as he knew, defendant lived in Rockford, not Belvidere, in 2013. Washburn added that, on the date of the extractions, (1) there was a Snapchat account belonging to Nina on the iPhone, (2) the only information in the iPhone listing defendant as a contact was an email address, and (3) phone number (815) ***-3459 was listed in the iPhone as being assigned to a person named Isaac Perez. On the date of the extractions, contact information in the Samsung phone likewise associated Isaac with phone number (815) ***-3459. Washburn further testified that he performed a gunshot residue test on defendant on November 30, 2013, after defendant turned himself in. The Illinois State Police refused to test the sample that was submitted, as it was not a kit that was authorized by the state police.

¶ 68    On re-direct examination, the State asked Washburn about whether the records he received from Sprint were "exact" if they did not match up precisely with the records from the phone extractions. Washburn explained to the jury that the differences between the call data in Sprint's

records and the information retrieved from the phone extractions were caused by the fact that there is a delay between when one phone places a call and when the other phone receives it.

¶ 69                                    2. *Raschke's Testimony*

¶ 70    Raschke was a special agent with the Federal Bureau of Investigation (F.B.I.) and a member of the agency's Cellular Analysis Survey Team.  He testified that historical cell-site analysis is "the collection, interpretation, [and] analysis of records maintained by the cell phone company in order to take that raw data that they provide and create a visual depiction of what that data is telling us."  The purpose of historical cell-site analysis is to determine a general or approximate location of where a phone was at a given point in time.

¶ 71    Raschke testified that he completed a historical cell-site analysis from Sprint's records pertaining to phone number (815) ***-3459.  Sprint included the following disclaimer with the records:

> "Please be advised that due to server capacity problems, Reveal, the database used to provide Per Call Measurement Data, has been struggling to process all of the data coming off the network.  The platform is no longer collecting data from all sites until the capacity issues are fixed.  At this time, there is no estimated date this issue will be resolved. Therefore, any attached record may be incomplete.

> ***

> PLEASE READ

> PCMD- (Per Call Measurement Data) takes RF (Radio Frequency) measurements during a call.  This is how the Distance in miles, Latitude and Longitude are determined. This is the estimated location of the mobile device when the RTD (Round Trip Delay) was taken during the connection.  There are many variables that can affect the accuracy of these

measurements. Multipath of the radio wave to or from the mobile device may affect the accuracy. Sprint mobile devices may be in a one way connection or multiple hand-off connection with different sectors on the same cell site or different sectors on different cell sites when the measurements were taken which can affect the accuracy. Sprint has repeaters deployed throughout the network. If a repeater was being used when the measurements were taken, the accuracy will be affected.

Sprint will not guarantee the accuracy of the location information."

¶ 72    Raschke testified that he used Sprint's call detail records and Per Call Measurement Data records to perform the historical cell-site analysis in this case. The call detail records showed which phones were involved with particular calls, along with the dates and times of the calls. The Per Call Measurement Data records provided additional information for the same calls, including: the tower and sector of the tower that was used for the call, the distance between the phone and the tower during the call, and the longitude and latitude of the phone at the time of the call. Raschke testified that he did not use the longitude and latitude information provided by Sprint, as that data had generally been determined to be inaccurate by both Sprint and the F.B.I. He did, however, use the distance measurements provided by Sprint, which he testified were generally accurate even though Sprint did not guarantee their accuracy. To that end, he noted that he had successfully used this type of information in other investigations to locate individuals.

¶ 73    According to Raschke, Sprint's disclaimer meant that Sprint would not attest that its data was accurate; however, Sprint was not saying that the data was "absolutely not accurate." Raschke explained that Sprint's Per Call Measurement Data was based on an algorithm that approximated distance by measuring the time that it took for a signal to travel. Sprint developed that technology to monitor how the network was functioning, not to track individual phones. Various factors may

affect the accuracy of the distance measurements. Raschke repeatedly emphasized that the distance measurements were mere approximations and that he could not provide specific locations of the subject phone at any particular time.

¶ 74   Raschke plotted the raw data that was reflected by Sprint's records for numerous calls associated with phone number (815) ***-3459 between 12:08 a.m. and 12:57 a.m. on November 30, 2013. He prepared a slideshow that he referenced for demonstrative purposes. For each call, based on the tower that was used, the sector that was used, and the distance provided, Raschke plotted a 120 degree arc on a map that represented an estimated area where the phone was located at the time of the call. He designed each arc to be either two-tenths of a mile or four-tenths of a mile wide to account for the fact that the distance measurements provided by Sprint were only meant to be approximate.

¶ 75   For example, given that Sprint's records reflected that there was a call at 12:08 a.m. that used sector 3 of tower 1347, and given that the phone was estimated by Sprint to be 1.45 miles from the tower at the time, Raschke was able to plot a particular arc. The location of the shooting in Belvidere was within that arc. The other arcs that Raschke plotted were generally consistent with the State's theory of defendant's whereabouts in the aftermath of the shooting. Although Raschke never explicitly testified that the phone associated with number (815) ***-3459 was in any precise location at any particular time, he said that common sense dictated that the phone would be located in the area where the arcs from several different phone calls overlapped: *i.e.*, in the area where the Navigator was fleeing from Sergeant Reid.

¶ 76                      H. Verdicts and Sentencing

¶ 77   The jury found defendant guilty of all charges and found that he personally discharged a firearm. The court sentenced defendant on 5 of the 8 counts to an aggregate of 95 years in prison.

Defendant timely appealed.

¶ 78                                   II. ANALYSIS

¶ 79    On appeal, defendant argues that (1) the evidence was insufficient to support his convictions, (2) the court erred in finding his cellular technology expert unqualified to testify, (3) the court erred in allowing Washburn and Raschke to testify to various matters, (4) the court erred in admitting gang evidence, and (5) the court erred in admitting Pena's testimony about the photographs that he viewed on Facebook.

¶ 80                          A. Sufficiency of the Evidence

¶ 81    Defendant first challenges the sufficiency of the evidence.  His sole challenge is that the State failed to prove that he was the fourth occupant of the Navigator who shot Galicia.[2]  He segregates the State's evidence into four categories: (1) accomplice testimony from Patton, (2) jailhouse-informant testimony from Pena and Brooks, (3) cellular phone evidence, and (4) gang testimony.  Although defendant asserts that "[a] substantial amount of this evidence should have been deemed inadmissible," he maintains that, even assuming the admissibility of the evidence, "[n]o rational and reasonable juror could find guilt beyond a reasonable doubt based upon such

_____

        [2] Defendant does not challenge his conviction of unlawful possession of a firearm by a street gang member on the basis that the State failed to prove that the Latin Kings were a street gang.  We note that, subsequent to the briefing in this matter, our supreme court issued its opinion in *People v. Murray*, 2019 IL 123289, explaining in detail what the State must prove to sustain a conviction of this offense.  As the issue was not specifically raised here, we express no opinion as to whether the State proved that the Latin Kings were a street gang.  We do not intend for our decision to have *res judicata* effect as to that issue.

evidence." Defendant then details what he considers to be the myriad flaws in each of the four categories of the State's evidence.

¶ 82    We cannot set aside a criminal conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Collins*, 106 Ill. 2d 237, 261 (1985). We do not retry defendant; instead, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "The trier of fact has the responsibility to assess witnesses' credibility, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the evidence." *People v. Hunt*, 2016 IL App (2d) 140786, ¶ 37. It is the fact finder's role to determine "how flaws in part of the testimony affect the credibility of the whole." *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004). Given, however, that the fact finder's judgment must be reasonable, "[i]in some cases a reviewing court may find, after considering the whole record, that flaws in testimony made it impossible for any fact finder reasonably to accept any part of it." *Cunningham*, 212 Ill. 2d at 283. Where, however, "the record is not such that the only inference reasonably drawn from flaws in the testimony is disbelief of the whole, a reviewing court should bear in mind that the fact finder had the benefit of watching the witness' demeanor." *Cunningham*, 212 Ill. 2d at 284.

¶ 83    We hold that the evidence was sufficient to support defendant's convictions. The police found the murder weapon on the driver's seat of the Navigator. All four doors of that Navigator were open, and nobody was inside. It was thus a reasonable inference that four people escaped from the Navigator, even though police officers saw only the three individuals who fled to the west.

¶ 84    The questions for the jury included whether defendant was the fourth occupant of the Navigator and what role, if any, he played in the shooting.  The surviving victims, Casas and Estrada, saw two men but did not get a good look at their faces.  Shortly after the shooting, Estrada told the police, apparently with either 85% or 100% confidence, that Rubalcava was the shooter.  That identification was based primarily on Estrada's knowledge of Rubalcava and Rubalcava's voice.  Nevertheless, there was evidence suggesting that Estrada may not have been so certain when he spoke with the police that Rubalcava was the shooter.  For example, Estrada refused to "point the finger" at Rubalcava despite being given the opportunity by police officers to do so.

¶ 85    Patton initially refused to cooperate with the police.  She was belligerent and under the influence of alcohol.  After having an opportunity to sleep and to think about the situation, including the officers' threats that she would be charged with murder, she decided to cooperate.  At trial, Patton detailed the events leading up to the shooting, the shooting itself, and the aftermath of the shooting.  She testified that Figueroa and defendant exited the Navigator in Little Mexico or Little Village, and she said that she and Garcia did not drive too far before she heard gunshots nearby.  That account was consistent with Casas' and Estrada's testimony that two men surrounded their Impala and that one of them opened fire after a brief exchange of words.  Although Patton did not witness the shooting, she testified that defendant got back into the Navigator and immediately exclaimed that he "shot that nigga in the face."  According to Patton, as defendant said that, he was holding a gun in his hand that had an extended "clip."  The weapon that was ultimately determined to have fired the shots that killed Galicia had an extended magazine.

¶ 86    In discounting Patton's testimony, defendant characterizes her as an "accomplice."  The State does not dispute that characterization.  Our supreme court has explained that, even though accomplice testimony " 'has inherent weaknesses' " (*People v. Brown*, 185 Ill. 2d 229, 247 (1998)

(quoting *People v. Young*, 128 Ill. 2d 1, 47 (1989))), such evidence will sustain a defendant's conviction " 'if it convinces the jury of the defendant's guilt beyond a reasonable doubt' " (*Brown*, 185 Ill. 2d at 247 (quoting *People v. Smith*, 177 Ill. 2d 53, 74 (1997))). The jury was aware of Patton's background, including her criminal convictions and her association with or membership in the Latin Kings. The jury also knew that Patton had an incentive to disavow any prior knowledge of her associates' criminal intentions to avoid charges herself. Indeed, the court gave the jury Illinois Pattern Jury Instructions, Criminal, No. 3.17 (approved Oct. 17, 2014), which provides: "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." Under the circumstances, the jury was entitled to credit Patton's testimony, which provided a plausible account of her groups' actions on the night of the shooting.

¶ 87    Pena and Brooks testified that defendant made inculpatory statements. "[T]he testimony of jailhouse informants is not to be viewed as inherently unbelievable." *People v. Belknap*, 2014 IL 117094, ¶ 55. Instead, the jury must determine their credibility the same as any other witness. *Belknap*, 2014 IL 117094, ¶ 55. Nevertheless, the testimony of jailhouse informants "must be viewed with caution given that such informants often expect to and do receive consideration on their own charges and sentencing in return for their testimony, thus providing an incentive to testify falsely." *Belknap*, 2014 IL 117094, ¶ 57. Pena and Brooks indeed received favorable deals from the State in their own cases in exchange for their testimony against defendant, and the jury was informed of that fact.

¶ 88    Pena's testimony corroborated many aspects of Patton's testimony. Pena also provided additional facts that were not included in Patton's testimony. Given that Pena was in the same

gang as defendant and that they knew each other before they went to jail, it is logical that defendant might confide in him. A reasonable trier of fact could have credited his testimony.

¶ 89    Brooks' testimony corroborated the testimony of Patton and Pena in many respects. On the other hand, Brooks' testimony ran contrary to the known facts on multiple points. Specifically, Brooks claimed that defendant said that he fired two shots; other evidence established that Galicia was shot four times and that numerous other shots were fired at the Impala from the same gun. Brooks testified that defendant said that the police chase ended near the intersection of Perryville and Alpine; other evidence established that the chase ended near Perryville and Spring Creek. Brooks testified that defendant said that only two people jumped out of the Navigator; other evidence established that at least three people did so. Brooks testified that a female was driving the Navigator; other evidence established that Garcia, a male, was driving. Moreover, while defendant understandably might confess to Pena, who was a fellow gang member and ran in the same social circles, it is less apparent why defendant would open up to Brooks, a new acquaintance with no gang ties. Given the major discrepancies in Brooks' testimony, and considering that the testimony of jailhouse informants generally must be viewed with caution, defendant's convictions certainly would not stand if they rested on Brooks' testimony alone. In light of the other evidence linking defendant to the shooting, however, a rational jury could have determined that the State proved defendant guilty beyond a reasonable doubt.

¶ 90    The State's gang evidence further supported defendant's convictions. Dammon's explanation of the historic feud between the Latin Kings and the Sureño 13s in Belvidere, along with his testimony about the gang affiliations of the various co-defendants and victims, provided a motive for events that otherwise might seem random. See *People v. Cavazos*, 2015 IL App (2d) 120444, ¶ 76 ("Generally, gang evidence is admissible to show common purpose or design, or to

provide a motive for an otherwise inexplicable act."). The gang evidence also provided context for Patton's testimony that either defendant or Figueroa mentioned going to Little Mexico or Little Village that night to "get at somebody." There was thus sufficient evidence to support defendant's convictions.

¶ 91 The State's evidence also included cellular phone evidence. Defendant argues that the probative value of that evidence was "negligible." We disagree. Circumstantial evidence linked phone number (815) ***-3459 to defendant on the night of the shooting. For example, Sprint's records showed that defendant's father was the subscriber for the account associated with this number. Around the time of the shooting, this phone number was in communication with other phone numbers that were associated with defendant's family. Furthermore, Raschke's historical cell-site analysis placed the phone connected with number (815) ***-3459 in the areas of both the shooting and the police chase. This corroborated Patton's testimony that defendant was present in the Navigator both before and after the shooting. Defendant criticizes Raschke's testimony as being based on bad data, insofar as Sprint would not guarantee the accuracy of its records. However, Sprint never claimed that the distance measurements it provided were *inaccurate*. The jury was aware of Sprint's disclaimer and the various factors that might affect the accuracy of the data.

¶ 92 Viewing the evidence in its totality and in the light most favorable to the State, a rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.

¶ 93                                    B. Kennedy's Qualifications

¶ 94 Defendant next argues that the court erred in finding his proposed cellular technology expert, Joseph Kennedy, unqualified to testify. The State responds that defendant acquiesced to any error, given that (1) he successfully advocated for a high standard when he moved to disqualify

the State's original expert, Washburn, and (2) the court merely applied that same standard when it subsequently found Kennedy unqualified to testify. The State further maintains that Kennedy was less qualified than Washburn to testify as an expert. The following additional background is necessary to understand the parties' arguments.

¶ 95    In his second motion *in limine*, defendant sought to bar the State from introducing any evidence relating to the location of the cellular phone with the number (815) ***-3459 on the night of the shooting. Defendant argued *inter alia* that the State failed to disclose an expert who was qualified to perform a historical cell-site analysis.

¶ 96    The State originally intended for one of its police officers, Washburn, to testify as to the historical cell-site analysis of the phone number. At the hearing on defendant's second motion *in limine*, the parties conducted *voir dire* of Washburn and debated his expert qualifications. Defendant argued that Washburn was not qualified. According to defense counsel, Washburn's proposed testimony involved "pretty heavy scientific stuff" that might properly come in through a radio frequency engineer. Defense counsel contrasted Washburn's credentials with Raschke's, whom counsel deemed a "reigning expert" on the topic of historical cell-site analysis based on counsel's review of the reported case law. The court granted defendant's second motion *in limine*, barring Washburn from testifying as to whether the phone at issue was within a certain area at a certain time. According to the court, most of what Washburn discussed during his *voir dire* was based on science, which the average juror would tend to gloss over. Given that reality, the court ruled that the State would have to produce an expert who had "a little bit more background [than Washburn] to testify as to how cell phone towers work[,] as opposed to on-the-job training."

¶ 97    Thereafter, the State disclosed Raschke as its cellular phone analysis expert and defendant disclosed Kennedy as his expert. According to Kennedy's report, he proposed to testify that, due

to the disclaimer in Sprint's records, he would not have used Sprint's data to create a report. Kennedy also disagreed with the "maps" that Raschke created, because cellular antenna sector coverage areas are not simplistic "V" shapes and Sprint never stated a range of accuracy with respect to the cellular antenna Per Call Measurement Data.

¶ 98    Taking the position that Kennedy was even less qualified than Washburn to testify on this topic, the State filed its sixteenth motion *in limine* seeking to *voir dire* Kennedy. The court held a hearing on that motion. Kennedy testified as follows with respect to his qualifications.

¶ 99    Kennedy attended community college in the early 1980s, where he took engineering and electrical technology classes. He did not obtain a degree, and there was no cellular phone training involved in that curriculum. He earned a Bachelor of Science degree in computer science in 1987. That coursework did not involve cellular networks.

¶ 100    Kennedy was presently employed as a senior manager with Cherry Biometrics. Among other things, Cherry Biometrics analyzes call detail records, and Kennedy spends most of his time with the company serving as an expert witness. Kennedy had been qualified as an expert on 10 to 12 occasions. In one case, which arose in Missouri, he testified for the prosecution that, based on an analysis of cellular phone data, a particular phone had to have been within a 21-mile radius of a tower. Kennedy was not allowed to testify as an expert in a federal case in Florida in September 2016.

¶ 101    Kennedy previously worked at the Computer Sciences Corporation. In that capacity, he did a "small project" for the Army relating to digital communications, but that did not involve cellular networks or call detail records. One of his other projects was to assess the feasibility of incorporating wireless cellular phones and tablets for purposes of facilitating communication between Army bases and field members. That project likewise did not involve analyzing cellular

data records.  None of Kennedy's other work dating back to 1989 involved experience or training pertaining to call detail records or cellular networks.

¶ 102  Kennedy nevertheless had experience working with landline telephone networks. Specifically, in the early 1990s, he received one week of "[v]ery intense training" from AT&T on telephone switches.  Kennedy worked for another company at some unspecified time, where he served as the administrator of a telephone communications system.

¶ 103  Kennedy learned how to read call detail records from two people within his present company: Mike Cherry and Manfred Schenk.  Cherry had worked for Bell Laboratories and the National Aeronautics and Space Administration, but not a phone company; Kennedy did not know Schenk's background.  Kennedy did not have experience using call detail records to locate the phones of missing persons or fugitives.  He never took any classes taught by the F.B.I.  He never taught classes on cellular phone networks or call detail records.

¶ 104  Kennedy participated in a continuing education program that was presented by companies that develop hardware for cellular phone service providers.  The focus of that program was standardizing technology among service providers as they moved from 4G to 5G.  That training did not directly have anything to do with call detail records.  Kennedy was a member of the Virginia Wireless Association and the International Electronic and Electrical Engineers Communications Society.  While those organizations provided training on high-speed network technology and setting up phone infrastructure, neither organization directly pertained to interpreting cellular phone records.

¶ 105  Kennedy's training regarding radio frequency technology and antenna technology came from taking exams for the Federal Communications Commission (FCC) in the 1970s.  Kennedy had held an FCC license for forty years, which allowed him to build and use two-way radio

equipment. He acknowledged that the FCC license was basically an "amateur radio license" and that the test to get that license did not involve analyzing call detail records. He testified, however, that a cellular phone is a two-way radio where digital information is sent in parallel between the phone and the network. He explained that cellular phone technology was just an automation of the processes that he worked with in the 1970s.

¶ 106   During his *voir dire*, Kennedy outlined some of the basic technology of cellular phone networks. He indicated that a person would not necessarily need "a whole lot of training" to analyze call detail records. He believed that his background in physics, electrical technology, and some engineering courses—along with his knowledge of how radio frequencies and antenna patterns work—was sufficient for these purposes.

¶ 107   At the conclusion of *voir dire*, the court noted that, contrary to what defense counsel had argued at the previous hearing when Washburn's qualifications had been considered, Kennedy suggested that a person does not need particular training to plot cellular data. Defense counsel responded that, subsequent to the last hearing, the First District decided *People v. Wilson*, 2017 IL App (1st) 143183. According to defense counsel, *Wilson* explained that analyzing phone records to prepare a map showing which cellular towers were used on specific dates did not qualify as scientific evidence. Therefore, defense counsel argued, simply reading the telephone records was not scientific evidence, and defendant would "call Mr. Kennedy basically as somebody who can testify about how cellular telephones work."

¶ 108   The court then attempted to clarify the nature of Kennedy's proposed testimony. Defense counsel indicated that Kennedy would not be plotting data. Kennedy would instead rebut Raschke's testimony by discussing the direction of antennas, explaining the concept of coverage areas, and identifying what can be ascertained as to where a phone may or may not have been.

¶ 109   The prosecutor interjected that she was confused, as defendant had changed his stance since the last hearing as to what qualifies a person to testify on the topic of historical cell-site analysis. The prosecutor also argued that Kennedy was less qualified than Washburn to testify on this subject.   Defense counsel responded that Kennedy had certain knowledge and experience that Washburn lacked.   Nevertheless, defense counsel proposed that, in light of *Wilson*, the State now could call Washburn to testify about the historical cell-site analysis.

¶ 110   The court found Raschke's testimony in *Wilson* to be dissimilar from his testimony in the case at bar.   According to the court, in *Wilson*, Raschke did not render expert opinions, but simply took data and "put[ ] it in a format that one could understand."   The court explained that, in *United States v. Hill*, 818 F.3d 289 (7th Cir. 2016), by contrast, Raschke not only plotted data, but "gave an opinion as to how cell phone towers, in fact, work[,] including the advantages, drawbacks, confounds, [and] limitations."   The court noted that Kennedy did not have specialized training, apart from two employers who trained him on "something" and an FCC license from the 1970s. The court added that it did not know whether Kennedy's training and background had anything to do with either cell-site location or Kennedy's "ability to analyze how cell phone towers work."

¶ 111   Defense counsel emphasized that a witness does not have to be "the best person out there" in order to testify as an expert.   According to defense counsel, Raschke would testify about the location of a particular phone, and Kennedy would rebut that testimony by discussing "how the cell phones work, how the two-way radio aspect of it works, [and] its communication with the cellular tower and the distances."   The court then recalled that Kennedy did not testify during *voir dire* about how cell phone towers work; nor did he testify about their limitations, drawbacks, or ranges.   The court said that Kennedy likewise did not testify how he acquired such information. The court recognized that, although an expert in this field does not necessarily need F.B.I. training,

Kennedy had a bachelor's degree in computer science that had not been tied in at all.

¶ 112 The court questioned defense counsel further about Kennedy's qualifications to counter Raschke's opinion. Defense counsel mentioned, among other things, that Kennedy had been qualified as an expert before. The court replied that it did not know in what capacity Kennedy had been qualified in those cases. The court ultimately granted the State's sixteenth motion *in limine*, finding Kennedy unqualified to testify to the items set forth in his report.

¶ 113 Illinois Rule of Evidence 702 (eff. Jan. 1, 2011) provides, in relevant portion: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." "There are no precise requirements regarding experience, education, scientific study, or training" for a witness to qualify as an expert. *People v. Lovejoy*, 235 Ill. 2d 97, 125 (2009). Instead, "[a] person can be permitted to testify as an expert if that person's experience and qualifications afford him or her knowledge that is not common to the average layperson and will assist the jury in evaluating the evidence and reaching a conclusion." *Lovejoy*, 235 Ill. 2d at 125. Absent an abuse of discretion, we will not reverse the trial judge's decision as to whether to qualify a witness as an expert. *Lovejoy*, 235 Ill. 2d at 125. "We will find an abuse of discretion only where the trial court's decision is arbitrary, fanciful, or unreasonable, such that no reasonable person would take the view adopted by the trial court." *Lovejoy*, 235 Ill. 2d at 125.

¶ 114 As an initial matter, we reject the State's suggestion that the invited-error rule bars defendant from challenging the court's decision with respect to Kennedy's qualifications. Our supreme court has described that rule as follows:

"The rule of invited error or acquiescence is a procedural default sometimes

described as estoppel. [Citation.] Simply stated, a party cannot complain of error which that party induced the court to make or to which that party consented. The rationale behind this well-established rule is that it would be manifestly unfair to allow a party a second trial upon the basis of error which that party injected into the proceedings." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004).

According to the State, because defendant successfully advocated for a certain standard during the hearing on Washburn's qualifications, defendant should not be heard to complain that the court subsequently barred Kennedy under that same standard. Defendant, however, did not induce the court to find Kennedy unqualified or otherwise consent to that ruling. This case is distinguishable from the typical situation where the invited-error rule applies—*i.e.*, where a court takes a particular action at a party's request and then that party complains of the action on appeal.

¶ 115 Nevertheless, we hold that the court did not abuse its discretion in finding Kennedy unqualified to render the opinions outlined in his report. The court was justified in doubting how Kennedy's knowledge, skill, experience, training, and education tied in to the opinions that he proposed to render. Most of Kennedy's background did not directly involve cellular networks. Although Kennedy held an FCC license for many years and had experience with telephone communication systems generally, defendant did not demonstrate how that translated to an expertise in the cellular technology related to historical cell-site analysis. Furthermore, as the court noted, although Kennedy had previously served as an expert witness, it was not clear whether he was accepted in the precise areas of expertise that defendant was proposing here. Under these circumstances, the court acted within its discretion by finding Kennedy unqualified to testify.

¶ 116             C. Challenges to the Testimony of Washburn and Raschke

¶ 117 Defendant next challenges multiple aspects of Washburn's and Raschke's testimony.

Some of defendant's specific contentions were not preserved for review. See *People v. Sebby*, 2017 IL 119445, ¶ 48 ("To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion."). The State, however, does not argue that defendant forfeited these arguments. Instead, both parties brief this issue as if the arguments were preserved for review. Under these circumstances, we will consider defendant's contentions on the merits. See *People v. Lucas*, 231 Ill. 2d 169, 175 (2008) ("The doctrine of forfeiture applies to the State as well as to the defendant and the State may forfeit an argument that the defendant forfeited an issue by not properly preserving it for review."). "We will not disturb a ruling on the admissibility of evidence absent an abuse of discretion." *People v. Camacho*, 2018 IL App (2d) 160350, ¶ 23.

¶ 118                    1. *Arguments Directed at Washburn's Testimony*

¶ 119   Defendant asserts that Washburn, despite being found unqualified to testify as an expert, interpreted Sprint's disclaimer for the jury and did so in a way that was inconsistent with how Raschke interpreted the disclaimer. This argument is meritless, as Washburn never testified at trial about the disclaimer.

¶ 120   Defendant also criticizes the court for allowing Washburn to testify in a manner that was inconsistent with the court's pretrial rulings. We find no error. Prior to trial, the court barred Washburn from testifying about historical cell-site analysis. Specifically, Washburn could not offer any "opinion as to whether or not it was consistent that that phone was within a certain area at a certain time." At trial, Washburn did not attempt to ascertain the locations of defendant's phone on the night of the shooting. Instead, Washburn testified to matters that were within the scope of his investigation as a police officer, such as his review and interpretation of the information that was extracted from two cellular phones that he confiscated from defendant's

parents' home. To the extent that defendant objects to Washburn's explanation of why the call times that were listed in Sprint's records did not match up precisely with the call times that were listed in the actual phones, defense counsel opened that line of inquiry by arguing with Washburn on cross-examination about whether the call records were "exact." The court also found that Washburn's testimony on this subject was merely a matter of "common sense," as one set of data came from the cell tower and the other came from a mobile device. Thus, there would inherently be some delay between one phone placing a call and the other phone receiving that call. We conclude that the court acted within its discretion in allowing this testimony.

¶ 121 Defendant further asserts that Washburn's testimony regarding the data that was extracted from the iPhone and the Samsung phone was inadmissible hearsay. According to defendant, the only applicable hearsay exception would be the business-records exception, and the State failed to lay a foundation to admit this evidence as business records. The State responds that Washburn's testimony was not hearsay, because (1) the Internet searches on the Samsung phone were not introduced to prove the truth of the matters asserted, but rather to provide information about the investigation and defendant's involvement in the shooting, and (2) the information documenting the communications between phone numbers was computer-generated data.

¶ 122 The court overruled defendant's objections to the admission of the extraction data records during Washburn's testimony. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Ill. R. Evid. 801(a) (eff. Oct. 15, 2015). "A 'declarant' is a person who makes a statement." Ill. R. Evid. 801(b) (eff. Oct. 15, 2015).

¶ 123   In *Gayle v. State of Florida*, 216 So. 3d 656, 659-60 (Fla. Dist. Ct. App. 2017), the court explained that, although an extraction report of a cellular phone is not itself hearsay, it may contain hearsay.  Accordingly, if an extraction report contains information that is otherwise admissible pursuant to a hearsay exception, the State is not required to admit the report as a business record.  See *Gayle*, 216 So. 3d at 659-60.  The question here is whether Washburn testified to hearsay that was contained within the data that was extracted from the two cellular phones.

¶ 124   We agree with the State that many aspects of Washburn's testimony regarding his observations of the extraction data were not hearsay.  For example, Washburn testified that (1) as of February 2014, the iPhone was assigned the number (815) ***-0908, (2) the iPhone used a messaging application multiple times between November 14 and November 28, 2013, to communicate with telephone number (815) ***-0908 (*i.e.*, the same phone number), (3) the iPhone displayed certain incoming and outgoing calls that corresponded with the records that Washburn received from Sprint pertaining to telephone number (815) ***-3459 (the Sprint records were authenticated separately by a representative of Sprint and were admitted as business records), and (4) the Samsung phone was assigned number (815) ***-5916, a number that the Sprint records indicated had been in repeated contact with telephone number (815) ***-3459 around the time of the shooting.  None of this evidence constituted "statements" by a "declarant" within the meaning of Illinois Rule of Evidence 801, as there was no human input involved.  Instead, these were self-generated records of a machine's operations, which is not hearsay.  See *People v. Holowko*, 109 Ill. 2d 187, 193 (1985); see also *State of Missouri v. Reynolds*, 456 S.W. 3d 101, 104 (Mo. Ct. App. 2015) (cellular phone call logs are not hearsay, because they are "not statements made by a human declarant," but are instead "generated by the phone itself as a result of incoming and outgoing calls.").  Any issue with this computer-generated data "would go to the weight of the

evidence, not its admissibility." *In re Rocker*, 2017 IL App (4th) 170133, ¶ 42.

¶ 125  Washburn's testimony as to the Samsung's Internet search history likewise was not hearsay.  Only statements that "propose a proposition that can be either true or false" are "assertions" for purposes of the hearsay rule.  *People v. Burgund*, 2016 IL App (5th) 130119, ¶ 197.  Additionally, there is no hearsay problem when a statement is offered merely to prove that the statement was made.  *Burgund*, 2016 IL App (5th) 130119, ¶ 195.  As explained in *People v. Sorrels*, 389 Ill. App. 3d 547 (2009):

> " 'To qualify as hearsay, the words recounted in court must, for starters, constitute an assertion or statement of fact.  Many out-of-court utterances are self-evidently not assertions.  If a witness testifies to the out-of-court inquiry, 'What time is it?', that inquiry is obviously not an assertion of anything. * * * An out-of-court assertion of a fact may be true or untrue.  For that reason, its admissibility in evidence is problematic if offered to prove that fact.' "  *Sorrels*, 389 Ill. App. 3d at 554 (quoting *Holland v. State of Maryland*, 713 A.2d 364, 369-70 (Md. Ct. Spec. App. 1998)).

Here, the Internet queries about a recent shooting/police chase and how to remove gun powder residue from one's arms and clothing were not assertive speech for purposes of the hearsay rule, as the searches did not propose factual propositions than could either be true or false.  The search history was introduced merely to show that such inquiries were made, allegedly by defendant's mother.  The State was not using these inquiries to prove, for example, that a shooting or a chase actually occurred.  Therefore, the search history was not hearsay.

¶ 126  On the other hand, certain parts of Washburn's testimony involved information that reflected the assertions of human declarants.  For example, Washburn testified that there was a heading in the iPhone's settings that said "Anthony's stuff."  In a similar vein, Washburn testified

that the extraction data showed that the owner name for the iPhone was listed as "Anthony" and that this phone previously communicated with a phone number associated with the name "Nina." It seems that a human entered the owner name and contact information into the iPhone, as there was no evidence introduced that a phone could generate such information on its own. Moreover, the State used these statements in its closing argument to prove the truth of the matters asserted: *i.e.*, that Anthony was the owner of the iPhone and that Nina's phone number was (815) \*\*\*-0908 before the shooting. Washburn's testimony on these matters was thus hearsay. See *Henry v. State of Florida*, 264 So. 3d 182, 184-85 (Fla. Dist. Ct. App. 2019) (explaining that a photograph of the contact information that was contained within a witness's cell phone would not have been admissible had the State intended to use that information to establish the defendant's telephone number).

¶ 127   Having identified the narrow hearsay aspects of Washburn's testimony, the next question is whether any improperly admitted evidence requires a new trial. "Admission of hearsay is harmless if there is no reasonable probability the verdict would have been different had the hearsay been excluded." *People v. Pineda*, 349 Ill. App. 3d 815, 822 (2004). The State used this hearsay evidence to tie defendant to phone number (815) \*\*\*-3459, the number that was the subject of Raschke's historical cell-site analysis. In our view, the only conceivable prejudicial impact of this hearsay testimony would be if there were insufficient other competent evidence to tie defendant to this phone number. There was, however, sufficient circumstantial, non-hearsay evidence linking defendant to this phone number. This included: (1) evidence that defendant's father was the subscriber for the account associated with this number, (2) evidence that this phone number was in communication around the time of the shooting with other phone numbers that were associated with defendant's family, (3) evidence that a historical cell-site analysis placed the phone connected

with this number in the area of both the shooting and the police chase and (4) Patton's testimony that defendant was present in the Navigator before and after the shooting. Under these circumstances, any error in admitting hearsay was harmless.

¶ 128                    2. *Arguments Directed at Raschke's Testimony*

¶ 129   Defendant also contends that portions of Raschke's testimony were improper. According to defendant, despite the prosecutor's pretrial representation that Raschke did "not intend to give any opinion as to how to interpret what he did," Raschke, in defendant's words, "rendered detailed opinions." Defendant asserts that such opinions included that "the mystery cellular phone was traveling inside the Navigator at the precise time of the police chase" and that "the cell phone left the Navigator after the chase and traveled in a certain direction." Defendant further argues that Raschke exceeded the scope of permissible expert testimony by interpreting the disclaimer for the jury and introduced hearsay by relating his conversations with Sprint's personnel.

¶ 130   We find no error. The prosecutor's remark about Raschke not giving opinions came in the context of addressing whether it was necessary to hold a hearing pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), to determine whether Raschke's methodology had gained general acceptance. The State made it clear before trial that Raschke intended to plot the data that was available in Sprint's records. That data included Sprint's estimates of the distances between the phone and the cell tower at the time of each call. Raschke's testimony was in line with the State's pretrial representation, as his PowerPoint presentation included maps that plotted the information in Sprint's records.

¶ 131   The arcs that Raschke presented to the jury were generally consistent with the State's theory about defendant's directions of travel on the night of the shooting. Despite what defendant claims, however, Raschke never directly opined that any cellular phone was inside of the Navigator

during the police chase or that any phone was subsequently taken out of the Navigator. To the contrary, Raschke repeatedly testified that Sprint's distance measurements were mere approximations and that he could not ascertain specific locations of the phone at any particular time.

¶ 132   As part of the pretrial discussion about the potential need for a *Frye* hearing, the prosecutor also promised the court that she would make sure that Raschke did not "sugarcoat" Sprint's disclaimer. The disclaimer was admitted into evidence. The prosecutor did not question Raschke about it on direct examination; defense counsel raised that issue on cross-examination. In response to defense counsel's questions, Raschke interpreted the disclaimer to mean that, although Sprint would not guarantee the accuracy of its data, Sprint was not saying that the data was inaccurate. (That was consistent with the testimony of Sprint's record custodian, who said that the disclaimer meant that the information contained in the records "can or cannot be accurate.") Raschke also mentioned on cross-examination that Sprint's disclaimer had since been amended. According to Raschke, the updated disclaimer indicates that the latitude and longitude coordinates that Sprint provides are not accurate. Raschke explained that he never uses the latitude and longitude coordinates.

¶ 133   On redirect examination, Raschke testified that the information received from Sprint was the type of information that he analyzed all the time and which he had used successfully to locate people. Raschke testified that he had ongoing discussions with Sprint's personnel about the disclaimer, most recently at a conference in February. He explained that Sprint's disclaimer was not saying that its data was "absolutely not accurate." The following colloquy occurred between the prosecutor and Raschke:

"Q. What is [the disclaimer] saying?

A. It's saying that they're not going to come and say that this data is accurate. They're not going to come and say that that phone was exactly 1.45 miles from that tower. It's an approximation.

Q. It may not be accurate: is that correct?

A. It may not be exactly 1.45 miles. It's an approximation.

Q. But potentially, it may be accurate; is that correct?

A. Correct."

¶ 134 Defendant argues that Raschke improperly rendered the disclaimer "meaningless." Defendant insists that "[t]he jury should have been permitted to interpret the plain wording of the disclaimer on its own." We find no error, as defendant initiated this line of inquiry on cross-examination. Defendant's hearsay objection likewise is not well-taken. Although Raschke testified that he had conversations with Sprint, he never directly related the substance of those conversations. He only testified about the results of those conversations. Additionally, the conversations at issue formed part of the bases for Raschke's opinions. See Ill. R. Evid. 703 (eff. Jan. 1, 2011) ("If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."). Defendant also claims that Raschke "testified that his knowledge and expertise exceeded that of Sprint personnel," insofar as "Sprint subsequently changed their disclaimer to reflect that [Raschke's] opinions were not rebuttable by the disclaimer." The record does not support defendant's interpretation of Raschke's testimony. He never claimed to have more knowledge than Sprint's personnel, and he certainly did not say that his opinions were not rebuttable by the disclaimer.

¶ 135                                    D. Gang Evidence

¶ 136   Defendant next argues that the court erroneously admitted gang evidence.  Specifically, he argues that Dammon exceeded the scope of admissible expert opinion testimony by, in defendant's words, "advis[ing] the jury that Defendant was a thug, capable of committing, and guilty of, multiple violent crimes."  Defendant takes issue with Dammon's statement that rival street gangs "have a propensity to fight with one another, perform violent acts against one another as well as other crimes."  Defendant also asserts that Patton and Pena, despite not being qualified as gang experts, offered "expert testimony about gang culture and the vicious nature of gang members."  Defendant maintains that "[t]he testimony of Dammon, Pena and Patton amounted to an improper attack on [his] character," as their testimony "attributed countless prior bad and criminal acts" to him without any specific evidence that he had been involved in those acts.

¶ 137   Defendant further criticizes the State for not tendering Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved Oct. 17, 2014) during the instruction conference, given that the prosecutor suggested during pretrial motion practice that such instruction would be appropriate.  Finally, defendant contends that the court erred in admitting a photograph depicting him and other individuals posing in front of a black and gold flag while using hand signs associated with the Latin Kings.  According to defendant, because he did not dispute that he was a gang member, the photograph had no probative value.

¶ 138   Defendant proposes that he preserved this issue for review, as it was "encompassed" within his posttrial motion.  In the event we determine that the issue was not preserved, defendant, in a one-paragraph portion of his brief and in a conclusory manner, invokes both prongs of the plain-error doctrine.

¶ 139 The State preliminarily responds that defendant failed to preserve this issue by not including his specific objections in his posttrial motion.  The State also argues that defendant

2020 IL App (2d) 180073-U

forfeited plain-error review by failing to develop an argument as to why the alleged errors amounted to plain error.

¶ 140   We agree with the State that defendant failed to preserve his arguments, as they were not included in the posttrial motion.  See *Sebby*, 2017 IL 119445, ¶ 48 ("To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion.").  Any relief thus must come by virtue of the plain-error doctrine, which allows a court to excuse a procedural default in two circumstances:

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence."  *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

This doctrine is "a narrow and limited exception" to the rule of procedural default, and the defendant bears the burden of persuasion under both prongs.  *People v. Hillier*, 237 Ill. 2d 539, 545 (2010).

¶ 141   A defendant may forfeit plain-error review by not raising the issue or by raising it in a conclusory manner.  See *Hillier*, 237 Ill. 2d at 545 ("A defendant who fails to argue for plain-error review obviously cannot meet his burden of persuasion."); *People v. McCoy*, 405 Ill. App. 3d 269, 274 (2010) (a defendant who merely asserted that the case was " 'close for plain-error purposes' " forfeited plain-error review).  Defendant's argument that plain error occurred is conclusory.  He cites two cases for boilerplate language about the purpose of the doctrine, neither of which involved the alleged improper admission of gang evidence.  He makes no meaningful attempt to

demonstrate why plain error occurred. Accordingly, we deem defendant's arguments forfeited, and we decline to address them.

¶ 142                                    E. Facebook Evidence

¶ 143   Defendant finally argues that the court erred in allowing Pena to testify about the photographs that he saw on Facebook and what he told defendant about those photographs. Defendant challenges this evidence on numerous grounds.

¶ 144   In his opening brief, defendant argues this issue as if the matter were preserved. As the State correctly notes, defendant failed to include it in his posttrial motion. At the end of his reply brief, defendant adds a "catch-all" paragraph, in which he asserts that any unpreserved issues pertained to errors that amounted to plain error under both prongs. There is precedent supporting allowing a defendant to raise the issue of plain error in a reply brief. See *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010) ("[A]lthough defendant did not argue plain error in his opening brief, he has argued plain error in his reply brief, which is sufficient to allow us to review the issue for plain error."). However, as was true with defendant's argument about the gang evidence, defendant makes no meaningful attempt to craft a cogent argument about why the alleged errors with respect to the Facebook evidence amounted to plain error. Accordingly, we deem defendant's arguments forfeited, and we decline to address them.

¶ 145                                    III. CONCLUSION

¶ 146   For the reasons stated, we affirm the judgment of the circuit court of Boone County.

¶ 147   Affirmed.